[No. 7334]

## IN RE GERMAN DITCH & RESERVOIR COMPANY.

1. MAXIMS—*Alleging Contraries*—A party will not be heard to contend at the same time that in one respect a decree is a general adjudication of the priorities to the use of water for irrigation in a certain water district, and that it was not such an adjudication, but simply an equitable proceeding between those participating therein; nor that, for one purpose, the title to certain waters was a proper subject for adjudication, under the statutes, and that for other purposes it was not.

2. WATER RIGHTS—*Natural Streams—Tributaries*—Considering that from the beginning of settlement in Colorado irrigation has been the declared public policy; that the precipitation is small, and that many natural streams always have been dry during a portion of every year, *held* that the phrase "natural stream," in the constitution (Art. XVI, Secs. 5, 6) was used in the broadest sense and intended to include all tributaries, and the streams draining into other streams.

The word "tributary" as used in the statute relating to water districts (Rev. Stat. c. 72, VII) includes all sources of supply which go to make up the natural stream. Percolating waters finding their way to a stream are tributary thereto.

3. ——*Adjudication of Priorities—Notice*—An attempt to adjudicate the priorities to the use of water, under the statute, without notice served upon those who have filed with the clerk of the proper court their statements of claim to the use of water in the same district is not a compliance with the act of April 10th, 1905 (Laws 1905, 244, Rev. Stat. § 3289) or the earlier statutes (Rev. Stat. Sec. 3288). A provision in a decree given upon such defective service, that the priorities therein decreed "do not conflict with others in the district, of an earlier date," is without effect as to those who fail to participate in the proceeding.

4. ——*Petition for Review*—The purpose of the statute is to provide a method whereby the respective rights of all persons entitled to water for irrigation, in the water district, may be determined in one adjudication.

While under the statute (Rev. Stat. sec. 3313) parties interested may establish their priorities by appropriate action, within four years from the entry of the general decree, those designated in the section, as well as others, may come in within two years by their petition for review under Rev. Stat. § 3318. *Broad Run Co. v. Dewel Co.*, 47 Colo. 573 distinguished.

5. ——*Time of Appeal*—A decree assumed to adjudicate the priorities of certain parties to the use of water for irrigation in a certain water district. It was given without the statutory notice. Parties claiming to

be entitled to the use of water in the same district, and who had not appeared in such proceeding, petitioned for review. *Held* that only upon the denial of their petition did the decree become final as to them; and an appeal within two years next ensuing was in time. *Upper Platte &c. Co. v. Fort Morgan Company*, 22 Colo. 214 distinguished.

6. PRACTICE IN THE SUPREME COURT—*What May Be Assigned for Error*—Appellant will not be heard to complain of the effect of the decree given below as to others who were not parties.

7. BILL OF EXCEPTIONS—*When Necessary—Recitations of Decree Accepted*—The court below, in its findings of fact set out at great length, what in the opinion of the judge there presiding, the testimony established, declaring that its purpose in this elaboration was that the supreme court, in case of appeal, might have full opportunity to understand the reasons upon which the decree proceeded. *Held* that parties making no objection, at the time, would not be heard to contend that these recitations should not be accepted upon appeal.

*Appeal from Denver District Court.*—Hon. HARRY C. RIDDLE, Judge.

Messrs. GOUDY & TWITCHELL, and Mr. J. H. BURKHARDT, for appellants.

Mr. GEORGE S. REDD, Mr. EDWIN H. PARK, Messrs. SMITH, BROCK & FERGUSON, Mr. W. W. PLATT, Mr. JACOB FILLIUS and Mr. J. W. BARNES, for appellees.

Mr. JUSTICE HILL delivered the opinion of the court.

On May 19th, 1906, the German Ditch and Reservoir Company filed in the district court of the city and county of Denver its petition entitled "In the Matter of the Application of The German Ditch and Reservoir Company for the adjudication of priorities of water rights in Water District No. 2, situated in what was formerly known as Arapahoe and Weld Counties, now in Adams and Weld counties, state of Colorado." The petition sets forth, that the petitioner is the owner of the German ditch, situate in water district No. 2 in Adams and Weld counties, and is also the owner of certain reservoirs used in

connection with said ditch, which reservoirs are situate in water district No. 2 in Adams and Weld counties; that said ditch and reservoirs take their water from Dry creek in said water district, an intermittent stream in no way connected with any other natural water source; that the water taken by petitioner therefrom is for irrigation purposes, for land along the line thereof; that the petitioner is interested as such owner in the adjudication of priorities of right to the use of water of said stream and tributaries thereof for irrigation purposes in said water district No. 2; that there are other ditches along the line of Dry creek claiming water therefrom for the purposes of irrigation, whose rights of priority, together with those of the petitioner, should be adjudicated in the manner as is provided by law. The prayer reads, "Wherefore, your petitioner prays that your Honor will proceed to an adjudication of the priorities of right to the use of water for irrigation purposes between the several ditches, canals and reservoirs and the owners of water rights in said water district No. 2 in said state, under the provisions of the constitution and the laws of the state of Colorado in that behalf provided."

An order was entered appointing a referee to whom was referred the petition and all statements of claims to the use of water for irrigation from the natural streams of said water district theretofore filed or that might be thereafter filed in said proceeding. The order included instructions to take evidence, etc., and vested in the referee all powers and duties required of referees pertaining to such adjudications. The referee accepted the appointment, took the oath of office, and executed his notice to all persons interested as owners or consumers of water in water district No. 2, including therein the times and places for the filing of statements, the hearing of evidence, etc. The only purported service upon the other appropriators in the district is by proof of the publica-

tion of this notice for the required time in newspapers in Adams county and in the city and county of Denver, with an affidavit of the posting, for the time required, of ten or more copies of the notice in Adams county. The referee proceeded to take evidence, filed his final report and recommendations for which he presented bills against the counties of Adams, Weld, Boulder, Jefferson and Arapahoe, which by order of the court were ordered paid by these counties in harmony with the general adjudication statutes. The referee's report discloses that some eight or nine persons and corporations appeared and filed their statements of claim for eight or nine ditches, and about seventeen reservoirs, concerning which evidence was taken. He recommended that priorities be decreed to these ditches, and reservoirs from Dry creek of approximately one hundred forty cubic feet of water per second of time to the ditches, and about one hundred million cubic feet for storage purposes for the reservoirs. Upon May 22d, 1908, a decree was entered by the court, which in general was in harmony with the recommendations of the referee. This decree purports to fix and establish the priorities of the claimants to water to be obtained from Dry creek for the ditches and reservoirs of the persons and corporations who filed in this particular action their statements of claim. It also decrees that the priorities therein awarded do not interfere, and are not in conflict with, those of other consumers in this water district.

Upon March 17th, 1909, the Platte Valley Irrigation Company, the Fulton Irrigating Ditch Company, and the Farmers' Independent Ditch Company, after giving notice to all parties named in this decree, filed their petition of intervention praying that the court grant to them and others who might see fit to come in, a rehearing, review and reargument; that they be permitted to introduce testimony which would enable the court to

determine whether said Dry creek is a natural stream, and whether the parties who had theretofore participated in said proceedings were entitled to the priorities decreed them; that the court permit a hearing upon the sufficiency of notice in said alleged proceeding, and the validity of the so-called decree, to the end that the interest of all parties in the use of water in water district No. 2 be fully maintained. This petition alleges that in April, 1883, in pursuance of proceedings duly had as provided by statutes, a decree was duly entered in the district court of Arapahoe county (now the city and county of Denver), adjudicating the water priorities and rights of the various ditches then having their headgates in water district No. 2, taking water from the South Platte river and its tributaries within said water district, including Dry creek mentioned in the present cause. It sets forth the numbers and dates of the priorities awarded to each ditch under the earlier decree, with the dates of their respective appropriations; this includes priorities both antedating and subsequent to the dates of some of those named in the 1908 decree. This is followed with the allegation that at the date of this 1908 decree the intervenors were the owners of certain ditches which were awarded certain priorities by the 1883 decree. It is then alleged that upon account thereof the petitioners are entitled to the respective amounts of water decreed to them, and that by such decree all the waters of said Dry creek and its tributaries in said water district No. 2 were adjudicated. This is followed by allegations of another decree entered in 1888 adjudicating certain other priorities upon Dry creek. It is also alleged, that the Dry creek mentioned in the various petitions in this action is a natural stream, and a tributary of the South Platte river; that ever since the entering of the 1883 decree the petitioners and others having priorities of water under said decree have

required, in the irrigation seasons, all the waters flowing into the South Platte river and its tributaries coming into said water district No. 2, except in extreme high floods; that all the water coming into said Dry creek from precipitation and from seepage and other sources has at all times flowed down the channel of said Dry creek into the channel of the South Platte river, and been utilized and is a part of the natural flow of the South Platte river, and of the said Dry creek, in supplying the priorities of the petitioners and others similarly situate in water district No. 2, having priorities under the 1883 decree, except where the same has been unlawfully utilized and diverted from the channel of Dry creek by ditches junior to those of these petitioners and others similarly situate in said water district. It then sets forth how and why the petitioners are injured upon account of this unlawful diversion.

It is alleged that the referee in attempting to give notice of the proceeding did not comply with the statutes; that neither the German Ditch and Reservoir Company, the clerk of the court, the referee, nor any other person served a notice as required by statute upon the petitioners, nor upon any of the parties similarly situate; that the petitioners owned and claim an interest in priorities and ditches in said district, which ditches take their supply from the South Platte river and its tributaries; that on or before the 1st of June, 1881, they filed with the clerk of the district court of Arapahoe county (now city and county of Denver), having jurisdiction of the priority of right for the use of water for irrigation in said water district No. 2, statements of claim under oath, entitled in the proper court, and in the matter of priorities of water rights in said water district No. 2; that at the time of said attempted adjudication the appellants had on file in the office of the clerk of the court their statements of claim filed with the clerk in compliance

with section 3277, Revised Statutes, 1908; that the petitioners had no actual or other notice of such proceedings, etc., and that upon rehearing they will be able to show that said decree interferes and affects vested rights held in them, and purports to decree to the other claimants priorities for water owned by said petitioners, etc.

The reargument and review were granted. The former claimants filed answers, which, while admitting the existence of the 1883 and 1888 decrees, denied the question of fact that said Dry creek was a natural stream, and denied that all waters coming into it from precipitation, seepage and other sources has at all times flowed down the channel of Dry creek into the Platte river, and denied that said water had been utilized as a part of the flow of the South Platte river, and denied that it has been used in supplying the priorities of the petitioners and others similarly situated, under the decrees of 1883 and 1888. These answers do not deny the appellants' allegation pertaining to the failure of personal service. Replications were filed to the answers. Evidence was taken upon the questions of fact. Thereafter, and upon the 19th of May, 1910, the relief sought by the appellants was denied; their petition dismissed, and the costs taxed against them. Upon the same date they filed their statement of appeal. This was ordered allowed, etc.

A motion has been made to dismiss the appeal because not applied for within two years from the date of the entering of the decree appealed from. It is claimed that the decree bears date May 22d, 1908, and no attempt was made to take or perfect the appeal until the 19th of August, 1910, which was more than two years after its date. In considering this motion it is necessary to review the record preceding the application for the appeal. By making the motion the movers concede that

the decree rendered is in pursuance of the statutory requirements providing for the adjudication of water rights; it is by authority of these statutes that they ask that the appeal be dismissed. In this we agree, as the record throughout discloses that the action is an attempt to secure an adjudication of certain priorities of water in this water district. It will not do to say, as contended in the briefs, that in one respect it was a general adjudication, and in another it was not, but was simply an equitable proceeding between the parties who saw fit to participate therein; nor in one respect that the title to this water was a proper subject for litigation under our general adjudication statutes, and for other purposes, as against the appellants, that it was not. If the proceedings as they purport to be, are an adjudication of priorities in this water district, then it must be conceded that the service as hereinbefore referred to was defective and failed to comply with the provisions of the act of 1905, or the earlier statutes in this respect; for this reason, generally speaking, the declaration in the decree that the priorities therein decreed did not in any manner interfere or conflict with others of an earlier date in the district, would not be binding against those who failed to participate in the action.

The appellants also appear to maintain a dual and inconsistent position in their attack upon the validity of this decree in so far as service is concerned. They first requested the privilege of reargument and review in order to have it qualified and made subservient to the priorities theretofore decreed them and others, with which it is alleged it conflicts, for this purpose they asked to be allowed to introduce evidence and to have the final decree so state. They also allege the failure of service, and upon account of this fact ask to have the decree set aside and declared void. The court permitted them to introduce testimony to sustain their con-

tention concerning the conflict of interest and proceeded to enter judgment against them. This included the finding that Dry creek was not a natural stream within the meaning of our adjudication statutes. They elected to accept the permission of the court for a reargument and review, including the submission of testimony. By having their contention thus heard and disposed of as prayed for, it would be illogical to allow them now to be heard to say that the court was without jurisdiction to proceed to a determination of the questions petitioned for by them, it being a case, where if proper service was made the court had jurisdiction. Whether the effect of the judgment is binding against others who did not come in, is a question with which they need have no concern and ought not to be allowed to raise, other than as it affects them upon the question of the dismissal of the appeal.—*Crippen v. Glasglow*, 38 Colo. 104, 87 Pac. 1073.

It will be observed that the appellants did not participate in the adjudication leading up to the decree of May 22d, 1908, and as above stated the service upon which that decree was rendered was ineffectual so far as it would affect the other appropriators in water district No. 2, who were without notice and did not participate. The granting of the appellants' petition for reargument and review, with the right to introduce evidence was the same in effect as vacating this decree so far as they were concerned, for up to that time it is conceded it had never been effective as against them. It follows that it never became final as an adjudication decree against them until by their actions they became parties thereto, and then not until the relief prayed for was denied, which was upon May 19th, 1910. This being the only judgment in the case which affected their rights in the premises the effect of which was to include against them the declarations in the decree of May 22d, 1908, which included the findings that Dry creek was not a

natural stream, and that the priorities adjudicated therefrom did not affect those contained in the earlier decree; it then became a decree against them as of this later date from which they had two years within which to appeal. The motion to be dismissed should be denied. The ruling in *Canal Co. v. Fort Morgan R. & I. Co.*, 27 Colo. 214, 60 Pac. 484, is not applicable to the facts here.

It is claimed that the appellants had no right, after judgment, to petition for a reargument and review for the reason that they are strangers to the action. Many cases are cited to sustain this position.

The fallacy with the argument lies in its assumption that they were strangers to the action. Upon the contrary, the original petition prays for an adjudication in water district No. 2. The statutory notice was attempted to be given. It is addressed to all those interested in this district and the decree purports to hold that all other consumers in the district are in no manner injuriously affected thereby, the result of which, had the service been good, would have ultimately been a decree against them in a court of competent jurisdiction, and made in the manner provided by the adjudication statutes. The fact should not be overlooked that the object of these statutes is to provide a method whereby these matters can be determined in one adjudication, in which all interested in the district in this respect have the right to participate; and while under certain conditions certain parties are given four years thereafter to establish their priority by an appropriate action, that is no reason why they, as well as the other class, cannot come in within the two years and make their showing by review and reargument, as provided for by section 3841, Mills' Annotated Statutes, Revised Edition.

The statement in *Crippen v. X. Y. Irr. D. Co.*, 32 Colo. at page 455, 76 Pac. 797, where this section was

under consideration in connection with parties to the action is applicable it is there said:

"The definition which appellants place upon 'party' is entirely too narrow. They would limit it to one who has notice of the proceeding and appears therein and offers proof, and gets a decree. But one is a party to these proceedings who has due notice thereof, or who appears therein or files his statement of claim; and the fact that he does not see fit to offer proof in support thereof, or fails to have his rights adjudicated, makes him as much a party to the proceeding as though he offered proofs and obtained a decree for his claimed priority."

The statements in *Broad Run Co. v. Deuel Co.,* 47 Colo. 573, 108 Pac. 755, concerning the relief to be secured by bill in equity instead of statutory adjudication, has no application to the facts here. In that case the original decree, on account of its age, was beyond attack under the two or four year statutes pertaining thereto. The action was by supplemental proceedings for the adjudication of water rights, instituted by the Trowel ditch in the same manner that this action was started. The Trowel ditch was constructed since the rendition of the old decree. In this adjudication it was sought to secure a priority for this ditch (which would antedate certain priorities contained in the old decree) but for lands which it was alleged were entitled to the earlier priority under what is commonly known as the Meadow act, section 3176, Revised Statutes 1908. It was claimed that these lands had been irrigated ever since 1875 by the natural operation and overflow of the river, and until the supply in the river had been decreased by the construction of large ditches and reservoirs, in that and other districts which held earlier priorities, and which consumed practically the entire available supply. For these reasons it was alleged that they were entitled in this later adjudication

to secure a decree bearing date of the first use of these lands in this manner and to have it awarded to the Trowel ditch, which had but lately been constructed, to carry water for the irrigation of these and other lands. It was this state of facts concerning which the opinion states the relief to which they were entitled, if any, should have been by bill in equity, instead of attempting to secure the earlier priority through a subsequent statutory adjudication which could not affect the priorities named in the earlier decree.

In the case at bar the appellants are not attempting to interfere with any vested right secured to appropriators under former decrees, but to the contrary they and others are the owners of priorities under the earlier decree which it is concede, upon account of its age, cannot be interfered with. They allege that the decree entered in this case, if enforced, will interfere with their vested rights. They are asking no relief other than that such rights be let alone. In order to ask it they come into the case in which the decree declares that the priorities awarded therein, although in part antedating some of theirs, yet do not affect them. It also purports to be an adjudication of a part of the waters in the district in which their canals are situate. They presented their petition and were allowed the reargument and review, within the two years from the date of the decree. Under such circumstances we are of opinion that it was not only proper to grant their petition for the reargument and review, but that it would have been prejudicial error to have denied it.

The question on which the case was disposed of is whether Dry creek is a natural stream within the meaning of our constitution; if it is, it stands admitted that it is a tributary of the South Platte river and that the priorities awarded from Dry creek are in conflict with, and inter-

fere with, the priority of rights of the intervenors and others under the decree of 1883. The appellants make the further contention that regardless of whether it is a natural stream, the waters secured therefrom within the meaning of our adjudication statutes are tributaries of the Platte river, and aid in furnishing its supply, and for this reason that they cannot be divested from serving such purpose. Many authorities are cited to sustain this contention. The evidence is not before us; for which reason it is alleged that we cannot consider these questions. The record proper includes the findings of fact of the trial court to which no exceptions were taken; they are full and complete. The conclusion reached from these findings are adverse to the appellants. If, from the findings of the court which are accepted as correct, the conclusion should have been otherwise, we do not think it was incumbent upon the appellants to present the evidence for the purpose of establishing the correctness of the findings, to which no objections are taken.

It is true, as contended, that in *Fanny Rawlings M. Co. v. Tribe,* 29 Colo. at page 305, 68 Pac. 205, this court said: ''Appellate courts must assume, in the absence of specific and unambiguous findings of fact to the contrary, that the lower court intended to find those facts which are responsive to the issues made by the pleadings, and essential to the judgment rendered.'' But in the case at bar we have specific and unambiguous findings of fact upon which the court states it bases its conclusion. They are full and complete and as stated by the court at the time, they were complete for the purpose, in case of an appeal, of advising this court of the reasons for the decision. This is self-evident from the statement of the court made at the time; it is as follows:

''In arriving at the conclusion which has been reached, the court has endeavored to cover, in its findings,

the testimony in detail, so that in the event that the supreme court should be called upon to review the case, it may have full opportunity to understand the reasons for the decision in this case, in so far as the facts are concerned.''

With this declaration of the court entered in the record preceding its findings, we think it was incumbent upon those now objecting, if they had any objections to the court's findings or to this method being followed, to have made them at that time; not having done so, after thus being advised of the purpose for which they were made, and as stated, they being full and complete, we do not think that they now ought to complain of their being accepted and used for the purposes intended.

The question for determination is whether, upon the finding of facts, the conclusion reached is correct. The finding of facts as set forth by the court, in substance, are that in the year 1859 what is now known as Dry creek disclosed certain physical characteristics, consisting of a channel with banks upon either side of varying height, and the channel varying in width from six feet to approximately twenty feet, and with a general course of direction northeast to the Platte river to a point where it intersects the channel of the Platte river; that the bed of the channel was composed of a clay substance with small gravel or sandy deposit appearing at widely separated points; that beginning with 1859 down to about 1880 a number of water-holes, or washouts, in the bed of the channel, were present at various points which usually contained more or less water, even in the dry season of the year; that several springs existed at early dates on or along the channel; that at several points cottonwood trees of mature growth were found growing along the banks, or in the immediate neighborhood on the banks of Dry creek; that the water-holes had no connection with

each other in the way of flowing water except at various seasons which will be hereafter mentioned; that while there is some testimony to the effect that some water found its way from the springs into the channel of the creek, it was in such an insignificant amount as would not in any event affect the amount or volume of water which may have flowed down the channel of the creek, and was insufficient, in times of drought, to create any running stream whatever, it being confined almost entirely to seep water from the springs; that at one or two points what appeared to be the bedrock became visible at the surface of the channel; that various gullies or gulches extended from the channel of Dry creek on both sides of the channel, these gullies or gulches affording a drainage for flood waters at times of rain and heavy snows, none of which, however, except in time of floods, carried running water in any quantity whatever; that Flat Top lake, or pond, consisted of a shallow depression on the top of what is known as Rocky Flats, which has been shown to have had a small amount of water contained in it, even as early as 1859, but the testimony does not show exactly the source of supply, although the court feels it is justified in saying it may be fairly attributable to flood waters only; that from this Flat Top lake, or pond, there is no well defined channel or outlet leading to any of the gulches, gullies or depressions which open into Dry creek; that the court is unable to state definitely that any water whatever has ever been known to flow from Flat Top lake through the intermediary gulches or depressions into the channel of Dry creek; that the territory adjacent to the channel of Dry creek consists of clay underlaid by water gravel, which in turn rests upon the bedrock, and that at various points in and along the course of Dry creek wells have been sunk for the purpose of obtaining water for domestic use, the wells varying in depth from four or five feet to fifteen or twenty feet, at which depth a fairly

abundant supply of water was obtained, although there is testimony to the effect that in seasons of extreme drought the supply of water furnished by such wells was very limited. The court further finds that a large territory drains into Dry creek during flood seasons, but that except in times of heavy rain or snowfall, there was no continuous or even intermittent surface flow of water moving down the channel of Dry creek, and the court further finds from all the testimony that no subterranean or subsurface flow of water ever existed during the early history of Dry creek, there not having been any evidence adduced sufficient to justify the court in finding that any such subterranean or subsurface flow ever existed, especially when the court takes into consideration the nature and character of the various elements which go to make up the channel of Dry creek. It is urgently insisted on the part of the intervenors that the waterholes which have heretofore been noticed, furnished evidence of such subsurface flow, but the court finds that the evidence does not establish that this is true, but on the contrary, that the water found in such holes during the dry seasons were deposits of water which came from flood waters and not in any appreciable quantity, at least, from any subflow, following down the channel of Dry creek. This condition remained practically unchanged until about the year 1880 or 1885, when certain ditches were constructed for the purpose of taking water from Clear creek, Coal creek, and Boulder creek, with the result that waste and seep waters from said ditches found their way into the channel of Dry creek. The testimony further discloses that beginning with the year 1885 down to the date of the hearing, this flow has gradually been augmented from year to year, until at the present time a considerable body of water continues to flow and finds its way down the channel of Dry creek, until it empties into the Platte river. The testimony further shows that the channel of

Dry creek has in recent years been somewhat enlarged at various points as the result of this increased flow, but that in all essential particulars, as to physical characteristics, the channel of Dry creek is approximately in the same condition as when it was first known in 1859. The testimony further discloses that the flow in Dry creek has been augmented in recent years by the introduction of certain drainage pipes which were constructed for the purpose of carrying off seep waters from adjoining lands, but the testimony shows that such seep waters are derived from waters coming from the aforesaid ditches and canals, and that this condition has existed for but a few years past, and as a result of extensive irrigation.

From these facts the court concludes that Dry creek does not fall within the definition of what is known as a natural stream, and that at no time since its history, beginning with the year 1859, the earliest date concerning which testimony was offered, down to the hearing, had it ever arisen to the dignity of what might properly be termed a natural stream. In our opinion this conclusion is in conflict with the findings of fact upon which it is attempted to be based. It also ignores the conclusion which must necessarily follow such a state of facts, viz., that natural percolating water finding its way to a natural stream is a tributary of the stream. Our statutes provide that water district No. 2 shall consist of land irrigated from ditches taking water from the South Platte river and its tributaries (except Big Thompson, St. Vrain and Clear creek) between the mouth of the Cache La Poudre and the mouth of Cherry creek. In describing certain other districts the language used is quite similar, while in others it reads that the district shall consist of all lands irrigated by water taken from certain named streams, and from the streams draining into the stream named. It will thus be observed that in describing the

sundry districts the legislature has used the words "tributaries and the streams draining into other streams named" as having the same meaning, otherwise they would be placing a different value upon water rights in different districts.

In *Strickler v. Colorado Springs,* 16 Colo. 61, 26 Pac. 313, 25 Am. Rep. 245, this court held that the rights of a prior appropriator from a stream cannot be impaired by subsequent appropriations of water from its tributaries. At page 67 it is said:

"All large streams are dependent upon tributaries for a supply of water. To cut off the water from such tributaries would be to destroy the capacity of the stream to the injury of those below. It would result in ruinous and useless expenditures of money in a race between rival claimants in the extension of ditches towards the source of water supply, and reward success at the expense of the rights of prior appropriators."

In *McClellan v. Hurdle,* 3 Colo. App. 430, 33 Pac. 280, it is said:

"It is probably safe to say that it is a matter of no moment whether water reaches a certain point by percolation through the soil, by a subterranean channel, or by an obvious surface channel. If by any of these natural methods it reaches the point, and is there appropriated in accordance with law, the appropriator has a property in it which cannot be divested by the wrongful diversion by another, nor can there be any substantial diminution. To hold otherwise would be to concede to superior owners of land the right to all sources of supply that go to create a stream, regardless of the rights of those who previously acquired the right to the use of the water from the stream below."

To the same effect in principle are: *Buckers Irr. Co.*

*v. Farmers' Ditch Co.,* 31 Colo. 62, 72 Pac. 49; *Bruening v. Dorr,* 23 Colo. 195, 47 Pac. 290, 35 L. R. A. 640; *Clark v. Ashley,* 34 Colo. 285, 82 Pac. 588; *Platte Valley Irr. Co. v. Buckers Co.,* 25 Colo. 77, 53 Pac. 334; *La Jara C. & L. S. A. v. Hansen,* 35 Colo. 105. 83 Pac. 644.

A reading of the above cases in connection with the sundry provisions of our statutes will disclose that in dividing the state up into water districts the legislature in using the words "tributary to a natural stream" did not intend their use in a restricted sense, that is that the tributaries themselves should be natural, continuous running streams, but as therein used it indicates that the word "tributaries" is used to include all sources of supply which go to make up the natural stream and which properly belong thereto.

In considering what is meant by the words "natural stream" as used in our constitution, it is proper to take judicial notice of conditions existing at the time of its adoption.—*Stockman v. Leddy,* 55 Colo. 24, 129 Pac. 220.

From the beginning of settlement in Colorado and in other arid regions of the west, irrigation has been recognized by federal and state legislation and by the decisions of federal and state courts as the declared public policy. In section 5 of article XVI of our constitution this public policy is thus expressed:

"The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."

Statutes have been enacted which provide a system for the distribution of the water to those entitled thereto. The natural streams of the state are non-navigable within its limits and practically all of them have their sources

within its boundaries. The volume of these streams is made up of rains and snowfall on the surface, the springs which issue from the earth, and the water percolating under the surface, which finds its way to the streams running through the watersheds in which it is found. It is likewise proper to take judicial notice of the fact that upon account of the elevation of the state and other reasons, the precipitation is quite small, and that a large number of natural streams in the state are, and always have been, dry during a portion of each year. When these facts are taken into consideration it is evident that the words "natural stream" as used in the constitution were intended to be used in their broadest scope and include within their definition all the streams of the state supplied in the manners above referred to, including tributaries and the streams draining into other streams.

This includes streams like the one under consideration as the facts stated by the court bring it clearly within the definition of a water course or natural stream.

In *Chamberlain v. Hemingway,* 63 Conn. 1, 27 Atl. 239, 22 L. R. A. 45, 38 Am. St. 330, it is said:

"A water-course consists of bed, banks and water. Yet the water need not flow continually; there are many water-courses which are sometimes dry. To maintain the right to a water-course it must be made to appear that the water usually flows in a certain direction, and by a regular channel, with banks and sides."

In *McClure v. City of Red Wing,* 28 Minn. 186, 193, 9 N. W. 767, 768, it is said:

"In a broken and bluffy region of country, like that part of southeastern Minnesota adjacent to the Mississippi river and its tributaries, intersected by long, deep coolies or ravines, surrounded by high, steep hills or bluffs, down which large quantities of water from rain

or melting snow rush with the rapidity of a torrent, often attaining the volume of a small river, and usually following a well-defined channel, it would be manifestly inappropriate and unjust to apply the rules of the common law applicable to ordinary surface water. In many respects such streams partake more of the nature of natural streams than of ordinary surface water, and must,·at least to a certain extent, be governed by the same rules.''

In *Earl v. De Hart,* 12 N. J. Eq. 280, 283, 72 Am. Dec. 395, it is said:

''If the face of the country is such as necessarily collects in one body so large a quantity of water, after heavy rains and the melting of large bodies of snow, as to require an outlet to some common reservoir, and if such water is regularly discharged through a well-defined channel, which the force of the water has made for itself, and which is the accustomed channel through which it flows, and has flowed from time immemorial, such channel is an ancient natural water course.''

In *Brown v. Schneider,* 81 Kans. 486, 106 Pac. 41, it is said:

''It is true, as contended, that there is not sufficient living water to make a continuous flow along the course of the stream. There must be a permanent source of supply, but it is not essential to a 'water course' that the flow should be constant and continuous. Surface water may be the source of supply, and the flow from that source is necessarily intermittent and somewhat irregular. It is sufficiently permanent if the accumulated surface water flows through a well-defined channel made by the water flowing with some regularity during the heavy rains which ordinarily occur in that region. * * * To constitute a 'water course' it is not necessary that the supply should be from springs, nor yet that the water

should be discharged through a channel into another water course.  The fact that the channel of the stream in question grew less distinct, and that it practically passed out of sight, before the waters reached Dry creek, does not argue that the stream lacks the characteristics of a water course.''

A case with quite similar facts to those here was but recently under consideration by the supreme court of New Mexico, *Jaquez Ditch Co. v. Garcia* (N. M.), 124 Pac. 891, in which, at page 892, it is said:

'' 'When surface water, having no definite source, supplied from fall rains and melting snows from a hilly region or high bluffs, and, owing to the natural formation of the surface of the ground, is forced to seek an outlet through a gorge or ravine, and by its flow assumes a definite and natural channel, and escapes through such channel regularly during the spring months of every year and in seasons of heavy rains, and such has always been the case, as far as the memory of man runs, such accustomed channel through which the water flows possesses the attributes of a natural water course.    *    *    *    The flow of the water need not be continuous, and the size of the stream is immaterial.'  *Mo. Pac. R. Co. v. Wren,* 10 Kan. App. 408.  'Where surface water from rains and snows in a hilly country by the natural formation of the ground seeks its outlet through a gorge or ravine, and by its flow assumes a definite channel, such a one, to a casual glance of the eye, bears an unmistakable sign of the frequent action of running water, and through which at regular seasons the water flows, and such has been immemorially the case, such a stream is a natural water course.' ''

Some of the other cases which sustain our conclusion are:  *Simmons v. Winters,* 21 Or. 35, 27 Pac. 7, 28 Am. St. Rep. 727; *West v. Taylor,* 16 Or. 165, 13 Pac. 665; *Ferris*

*v. Wellborn,* 64 Miss. 29, 8 South. 165; *Rait v. Furrow,* 74 Kan. 101, 85 Pac. 934, 6 L. R. A. (N. S.) 157, 10 Ann. Cas. 1044; *Kelly v. Dunning,* 39 N. J. Eq. 482; *Gibbs v. Williams,* 25 Kan. 214, 37 Am. Rep. 241.

Portions of the briefs are devoted to the alleged appropriation of seepage and waste waters which it is claimed have developed in Dry creek and its vicinity since 1885, and to the application of section 3177, Revised Statutes, 1908, thereto. As the evidence is not before us it would be useless to enter into a discussion of these questions. Some phases of which, under quite similar facts, have been considered in former opinions, in which certain declarations of law have been announced; to go further without the evidence would be but a matter of conjecture.

The judgment is reversed and the cause remanded with instructions (if the parties desire to proceed under the adjudication statutes) that notice be given to all parties interested in water district No. 2 as provided by law and that the proceedings thereafter be in harmony with the views herein expressed as far as applicable.

*Reversed.*

Decision *en banc.*

Mr. JUSTICE SCOTT dissents.

Decided December 1, A. D. 1913. Rehearing denied March 2, A. D. 1914.