The Supreme Court of the State of Colorado 
2 East 14th Avenue • Denver, Colorado 80203

2015 CO 64

Supreme Court Case No. 14SA302 
Appeal from the District Court 
El Paso County District Court Case No. 13CV31263
Honorable Larry Edward Schwartz, Judge
Ground Water Commission, Case No. 12GW10

In the Matter of Water Rights as applied for by Meridian Service Metropolitan District
Plaintiff–Appellant: 
Meridian Service Metropolitan District,
v.
Defendants–Appellees:
Ground Water Commission, a/k/a Colorado Ground Water Commission; Dick Wolfe in his
capacity as the Colorado State Engineer and as ex officio Executive Director of the Ground
Water Commission; Steven J. Witte in his capacity as Engineer for Water Division 2; Upper
Black Squirrel Creek Ground Water Management District; Edna Farmer; Dan Farmer; Jerry
Farmer; Joe Farmer, Jr.; Teresa Farmer; Farmer Pipeline Company, LLC; Cherokee
Metropolitan District; Paint Brush Hills Metropolitan District; Woodmen Hills Metropolitan
District; Wayne E. Booker; Frances Booker; and Staff of the Ground Water Commission.

Order Affirmed 
en banc
November 16, 2015

Attorneys for Plaintiff–Appellant:
W.B. Schroeder Law Office, LLC
Wayne B. Schroeder
Boulder, Colorado
Attorneys for Defendant–Appellee Ground Water Commission:
Cynthia H. Coffman, Attorney General
Susan Schneider, First Assistant Attorney General
Derek L. Turner, Assistant Attorney General
Patrick E. Kowaleski, Senior Assistant Attorney General
Denver, Colorado
Attorneys for Defendant–Appellee Upper Black Squirrel Creek Ground Water Management District:
Trout, Raley, Montaño, Witwer & Freeman, P.C.
Lisa M. Thompson
Douglas M. Sinor
April H. Killcreas
Denver, Colorado
Attorneys for Defendants–Appellees Edna Farmer; Dan Farmer; Jerry Farmer; Joe Farmer, Jr.; Teresa Farmer; and the Farmer Pipeline Company, LLC:
MacDougall & Woldridge, P.C.
Julianne Woldridge
Colorado Springs, Colorado
No appearance by or on behalf of: Dick Wolfe in his capacity as the Colorado State Engineer and as ex officio Executive Director of the Ground Water Commission; Steven J. Witte in his capacity as Engineer for Water Division 2; Cherokee Metropolitan District; Paint Brush Hills Metropolitan District; Woodmen Hills Metropolitan District; Wayne E. Booker; and Frances Booker.
JUSTICE GABRIEL delivered the Opinion of the Court.

 
¶1         In this case, plaintiff–appellant Meridian Service Metropolitan District (Meridian) appeals the district court’s order finding that Meridian sought to appropriate designated ground water that was subject to the jurisdiction of the Colorado Ground Water Commission (the Commission). Meridian principally asks us to decide whether storm runoff may be classified as “designated ground water” subject to administration and adjudication by the Commission, or whether such water is in or tributary to a natural stream, vesting jurisdiction in the local water court pursuant to the Water Right Determination and Administration Act of 1969, §§ 37-92-101 to -602, C.R.S. (2015) (the 1969 Act). We conclude that because this case presented a question as to whether the water at issue met the statutory definition of “designated ground water,” the Commission had jurisdiction to make the initial determination of the issue presented. We further conclude that the Commission, and the district court on de novo review, correctly found that a portion of the water at issue met the statutory definition of “designated ground water” and was therefore subject to administration by the Commission.
¶2         Meridian also challenges the district court’s order on claim preclusion, issue preclusion, stare decisis, and public policy grounds, and it asserts that the Colorado Groundwater Management Act, §§ 37-90-101 to -143, C.R.S. (2015) (the Management Act), is unconstitutional. We conclude that these arguments are not supported by the record or applicable law.
¶3         Accordingly, we affirm.
I. Facts and Procedural History
¶4         Throughout 1967 and into 1968, the Commission held hearings in the matter of the determination of a designated ground water basin in the Upper Black Squirrel Creek Basin (the Basin). Objectors raised numerous challenges to the proposed designation, including that the ground water in the proposed basin did not meet the statutory definition of “designated ground water.”
¶5         On May 1, 1968, the Commission entered its findings of fact, conclusions of law, and final order (the 1968 Order). As pertinent here, the Commission found that although “at some remote prehistoric time the channel of Black Squirrel Creek continued southerly to the Arkansas River,” during past geologic ages, wind and alluvial deposits had created a dam on the lower part of the channel, and this dam had created “a sizeable underground reservoir” in the upper and lower reaches of the stream. As a result, “virtually all” of the water in the basin was underground water, and water flowed on the surface only “during and immediately following” periods of heavy rainfall from summer storms. Because this water was “in an area not adjacent to a continuously flowing natural stream,” the Commission concluded that the water met the statutory definition of “designated ground water” and that the Basin therefore qualified as a designated ground water basin.
¶6         In 2011, Meridian filed an application in the District Court for Water Division No. 2 (the water court) for surface water rights in an “[u]nnamed tributary to the Upper Black Squirrel Creek.” Specifically, it claimed conditional rights to divert five cubic feet per second at four locations and to store 169 acre-feet of this water.
¶7         Several opposers challenged the water court’s jurisdiction over the matter. They claimed that the water that Meridian sought to appropriate, which they characterized as “storm run-off water that is a direct source of recharge” for the Basin, was designated ground water subject to administration by the Commission, rather than by the water court. The water court found that the opposers had “raised a valid issue” as to whether Meridian sought to appropriate water within the Basin that the Commission was required to allocate and administer. The court thus stayed its proceedings until the necessary proceedings before the Commission had been completed.
¶8         Meridian then initiated proceedings before the Commission, which referred the matter to a hearing officer. Relying on expert testimony, the hearing officer found, as pertinent here, that (1) the Basin was over-appropriated, and the Commission would not issue permits for new uses of designated ground water absent an approved plan to replace the depletions from the new uses; (2) “surface runoff from precipitation events quickly infiltrates into the alluvial sediments and does not flow on the surface for more than a few hours, except in rare, large, flood events . . . ”; (3) experts for both sides testified or provided evidence that Meridian’s proposed development would increase surface runoff due to the creation of impermeable surfaces; (4) but for Meridian’s proposed development, falling rain would either evaporate, be consumed by plants, or recharge the aquifer; (5) several reports had concluded that on a basin-wide average, approximately four percent of falling precipitation percolates far enough to recharge the aquifer; and (6) precipitation falling in the Basin would not reach a tributary stream.
¶9         Based on these findings, the hearing officer concluded that “the portion [of the falling precipitation] that can be determined to be recharge (not evaporated or consumed by water loving plants) is ‘designated ground water.’”
¶10         The Commission subsequently affirmed the hearing officer’s initial decision, and pursuant to section 37-90-115, C.R.S. (2015), Meridian appealed to the district court. After conducting a de novo review, the court agreed with the Commission, finding that (1) “[a]ll precipitation that falls in the UBS Ground Water Basin is water that would contribute to recharge of the aquifer and not existing surface streams”; (2) Meridian’s construction of impermeable surfaces had the practical effect of “building a giant concrete ‘catch pond’ above the aquifer”; and (3) “[t]here [was] nothing ‘natural’ about that process or the results” but rather “[t]he ‘streams’ are only ‘streams’ because they are man-made.” Accordingly, the court concluded that a portion of the water claimed by Meridian historically would contribute to the water supply of the Basin through precipitation and was therefore designated ground water over which the Commission had jurisdiction.
¶11         Meridian now appeals.
II. Analysis
¶12         Meridian raises four issues in this appeal: (1) the Commission lacked subject matter jurisdiction over this case; (2) the water at issue was surface water, not designated ground water; (3) the doctrines of claim preclusion, issue preclusion, and stare decisis barred the classification of the water at issue as designated ground water; and (4) public policy compels a result in Meridian’s favor. We review the legal issues presented de novo, but we will not disturb the district court’s factual findings unless they have no support in the record. McKenna v. Witte, 2015 CO 23, ¶ 12, 346 P.3d 35, 40.
¶13         We address and reject each of Meridian’s arguments in turn.
A. Jurisdiction
¶14         Meridian argues that the 1969 Act vests the water courts with exclusive jurisdiction over “water matters,” including applications for conditional rights like Meridian’s. According to Meridian, the “correlative principle” is that the Commission has no subject matter jurisdiction over “surface water,” even though it may be in a designated basin. We are not persuaded.
¶15         Subject matter jurisdiction concerns a court’s authority to deal with the class of cases in which it renders judgment. Closed Basin Landowners Ass’n v. Rio Grande Water Conservation Dist., 734 P.2d 627, 636 (Colo. 1987). The 1969 Act gives a water court exclusive jurisdiction over “water matters” within that court’s division. § 37-92-203(1), C.R.S. (2015). “Water matters” include “only those matters which [the 1969 Act] and any other law shall specify to be heard by the [water courts].” Id.
¶16         Meridian is correct that these “water matters” include the determination of conditional water rights. See § 37-92-302(1)(a), C.R.S. (2015). The 1969 Act, however, applies only to the administration of surface and underground water that is in or tributary to natural streams. See § 37-92-102(1)(a), C.R.S. (2015); see also Gallegos v.  Colo. Ground Water Comm’n, 147 P.3d 20, 28 (Colo. 2006). Such waters are “[w]aters of the state” and are subject to the 1969 Act. § 37-92-103(13), C.R.S. (2015). 
¶17         Designated ground water, however, does not constitute “waters of the state” and is administered separately. See id. (excepting designated ground water from the definition of “[w]aters of the state”); § 37-92-103(11) (defining “[u]nderground water” and providing that such water is considered different from designated groundwater). Specifically, the Management Act authorizes the Commission “[t]o supervise and control the exercise and administration of all rights acquired to the use of designated ground water.” § 37-90-111(1)(a), C.R.S. (2015).
¶18         When read together, $$[t]he Management Act and the 1969 Act create a conceptual framework which provides for appropriation and administration of designated ground water under the Management Act and appropriation and administration of all tributary water, except that which may be included in the definition of designated ground water, under the 1969 Act. State ex rel. Danielson v. Vickroy,627 P.2d 752, 757–58 (Colo. 1981).
¶19         The jurisdictional question in this case thus turns on whether the water that Meridian sought to appropriate was “designated ground water.”
¶20         We have long and consistently held that in the context of such a jurisdictional conflict, the Commission must make the initial determination as to whether the controversy implicates designated ground water. See Pioneer Irrigation Dists. v.  Danielson, 658 P.2d 842, 846–47 (Colo. 1983); Vickroy, 627 P.2d at 759–60. Jurisdiction shifts to the water court only if the Commission concludes that the water at issue is not designated ground water. Gallegos, 147 P.2d at 31–32; Pioneer, 658 P.2d at 846; see also Vickroy, 627 P.2d at 759–60 (“Only if [proceedings before the Commission] result in a determination that a water matter is at issue can the jurisdiction of the water court be invoked.”).
¶21         Here, as noted above, the evidence raised a question as to whether the water at issue was designated ground water. Accordingly, the case presented a jurisdictional conflict, and the district court correctly concluded that jurisdiction vested with the Commission to make the initial determination as to whether the controversy implicated designated ground water. See Gallegos, 147 P.2d at 31–32; Pioneer, 658 P.2d at 846–47; Vickroy, 627 P.2d at 759–60.
B. Classification of the Water
¶22         Meridian next contends that the district court erred when it ultimately found that the water at issue was designated ground water. We are not persuaded.
¶23         The Management Act defines “designated ground water” as $$that ground water which in its natural course would not be available to and required for the fulfillment of decreed surface rights, or ground water in areas not adjacent to a continuously flowing natural stream wherein ground water withdrawals have constituted the principal water usage for at least fifteen years preceding the date of the first hearing on the proposed designation of the basin, and which in both cases is within the geographic boundaries of a designated ground water basin. § 37-90-103(6)(a), C.R.S. (2015) (emphasis added).
¶24         “Ground water,” in turn, is defined as “any water not visible on the surface of the ground under natural conditions.” § 37-90-103(19) (emphasis added).
¶25         Accordingly, the determination of whether the water at issue was designated ground water turned on whether, “under natural conditions,” the water would be visible on the surface, § 37-90-103(19), and whether, in its “natural course,” it would be available for the fulfillment of decreed surface rights, § 37-90-103(6)(a).
¶26         Here, the district court found:
The precipitation that falls in the Basin would sink into the ground and be part of the ground water supply under natural or pre-development conditions and is water that would normally not be visible on the surface under natural pre-development conditions in the Basin, except during heavy rain events.
The court further found that the water that Meridian sought to divert was merely runoff that had been increased by Meridian’s construction of impermeable surfaces. Thus, the court concluded that the water at issue was “neither a ‘natural stream’ nor water that is ‘tributary to a natural stream’ under natural conditions.”
¶27         Because each of these findings was amply supported by the record, we conclude that the district court correctly found that a portion of the water claimed by Meridian as a result of its development was designated ground water over which the Commission had jurisdiction.
¶28         We are not persuaded otherwise by Meridian’s assertion that the district court incorrectly relied on what Meridian deems the “truncated” definition of “designated ground water” set forth in Vickroy. In Vickroy, 627 P.2d at 756, this court stated that the statutory definition of “designated ground water” “includes water not tributary to any stream, and other water not available for the fulfillment of decreed surface rights.” Although it is true that this statement twice omitted the word “ground” from the definition, it appears that these omissions were the result of a paraphrase and that no substantive change to the statutory definition was intended. More important, for the reasons set forth above, the district court’s analysis in this case correctly applied the pertinent statutory definition.
¶29         We likewise are unpersuaded by Meridian’s assertion that the district court erred in replacing this court’s broad 1913 definition of “natural stream” with a purportedly narrow dictionary definition. In support of this argument, Meridian relies on our decision in In re German Ditch & Reservoir Co., 139 P. 2 (Colo. 1913). We, however, see no inconsistency between the use of the term “natural” in German Ditch and the ordinary meaning of that term as used by the district court here.
¶30         In German Ditch, which preceded both the Management Act and the 1969 Act, we considered whether Dry Creek was a “natural stream” within the meaning of the Colorado Constitution. Id. at 6; see also Colo. Const. Art. XVI, §§ 5–6 (providing, respectively, that the water of every natural stream not previously appropriated is public property and that the right to divert the unappropriated waters of any natural stream to beneficial use shall not be denied). If Dry Creek was a natural stream, then it would have been tributary to the South Platte River and thus subject to the prior appropriation system established by the constitution. See German Ditch, 139 P. at 6.
¶31         In considering this question, we explained that the legislature did not use the phrase “tributary to a natural stream” in a “restricted sense,” such that “the tributaries themselves should be natural, continuous running streams.” Id. at 9. Rather, “the word ‘tributaries’ [was] used to include all sources of supply which go to make up the natural stream, and which properly belong thereto.” Id. Because the evidence established that for over twenty-five years, a “considerable body of water” had flowed and continued to flow down the channel of Dry Creek until it emptied into the Platte River, we concluded that Dry Creek was tributary to the South Platte River and therefore was a “natural stream.” See id. at 8–9.
¶32         Unlike the water at issue in German Ditch, the water that Meridian sought to appropriate here was not tributary to a natural stream. Indeed, the evidence established that the water would not reach a tributary system. Thus, the water at issue did not constitute a “natural stream” under the definition that we applied in German Ditch.
¶33         Accordingly, we conclude that the district court did not err in finding that “natural,” as that word is used in the Management Act’s definition of designated ground water, retains its common meaning. See Univex Int’l, Inc. v. Orix Credit All., Inc., 914 P.2d 1355, 1358 (Colo. 1996) (stating that in construing statutory provisions, a court “must look first to the statutory language itself, giving words and phrases their commonly accepted meaning”).
¶34         In light of our determination that a portion of the water that Meridian sought to appropriate was designated ground water and not unappropriated water of a natural stream, we need not address Meridian’s contention that because the Management Act interferes with its right to divert the unappropriated waters of natural streams, that act is unconstitutional. See Upper Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss, 993 P.2d 1177, 1182 (Colo. 2000) (noting that the General Assembly has “plenary authority” over the allocation and administration of, among other things, designated ground water, which is not part of the natural stream waters subject to the prior appropriation provisions of the Colorado Constitution).
C. Claim Preclusion
¶35         Meridian next contends that the doctrines of claim preclusion, issue preclusion, and stare decisis bar the Commission from revisiting and altering the 1968 Order by which it designated the Basin. Although Meridian’s appellate briefs reference all three doctrines, the substance of Meridian’s argument appears to be premised on claim preclusion. Specifically, Meridian understands the 1968 Order to conclude that the only designated ground water in the Basin was underground water in the alluvial aquifer. According to Meridian, this order was binding on the district court, and, thus, no water other than water currently underground in the alluvial aquifer could be deemed designated ground water. We disagree.
¶36         “Claim preclusion prevents relitigation of claims that were or could have been litigated in a prior proceeding.” Gallegos, 147 P.3d at 32. The claim preclusion doctrine applies when (1) the judgment in the prior proceeding was final; (2) the prior and current proceedings involved identical subject matter; (3) the prior and current proceedings involved identical claims for relief; and (4) the parties to the proceedings were identical or in privity with one another. Id.
¶37         Here, even assuming without deciding that the 1968 Order was a final judgment and that the prior proceeding and the present one involved identical subject matter (i.e., designated ground water in the Basin), Meridian has not established that the prior and current proceedings involved identical claims for relief. 
¶38         The identity of claims element “is bounded by the injury for which relief is demanded, and not by the legal theory on which the person asserting the claim relies.” Farmers High Line Canal & Reservoir Co. v. City of Golden, 975 P.2d 189, 199 (Colo. 1999).
¶39         As noted above, the purpose of the 1968 Order was the formation of a designated ground water basin, and this determination hinged on the Commission’s conclusion that “[t]he ground water found in the alluvial formation of the Upper Black Squirrel Creek is ‘designated ground water’ as defined in [the Management Act].”
¶40         The claim in this proceeding, in contrast, involves the classification of runoff created by Meridian’s proposed development. This claim was not, and could not have been, brought in 1968 because there does not appear to have been any proposed development or consequent runoff in the Basin at that time.
¶41         Accordingly, the claim preclusion doctrine did not prevent the Commission from finding that a portion of the water that Meridian sought to appropriate was designated ground water.
D. Public Policy
¶42         Finally, Meridian argues that public policy supports a ruling in its favor and against the opposers. Specifically, it asserts that (1) allowing it to appropriate storm runoff under the 1969 Act is in harmony with this court’s stated goal of “maximum utilization” of the state’s waters, see, e.g., State Eng’r v. Castle Meadows, Inc., 856 P.2d 496, 505 (Colo. 1993); (2) the district court erred in finding that a ruling in Meridian’s favor would effectively create a “super decree” not subject to a call by senior water users; and (3) the district court’s order results in substantial waste, namely, a ninety-six percent loss, because only four percent of precipitation falling in the Basin actually recharges the aquifer. For three reasons, we conclude that the district court’s ruling was consistent with public policy.
¶43         First, in Castle Meadows, 856 P.2d at 506, a case involving augmentation plans, we discerned a legislative intent to remove the incentive for people to attempt to increase water supplies by removing phreatophytes or replacing “natural land conditions with impermeable surfaces.” A ruling for Meridian in this case would condone just such a result and, thus, would be contrary to public policy. Cf. Se. Colo. Water Conservancy Dist. v. Shelton Farms, Inc., 529 P.2d 1321, 1327 (Colo. 1974) (warning, in the context of holding that water gained by the eradication of phreatophytes remains bound to the call of the river, that “unrestrained self-help to a previously untapped water supply would result in a barren wasteland”).
¶44         Second, the district court likened the water that Meridian sought to appropriate to the salvaged waters discussed in Shelton Farms, which this court concluded were subject to call by prior appropriators. Id. at 1325. Salvaged water, like some of the water at issue here, “ordinarily would go to waste, but somehow [is] made available for beneficial use.” Id. Despite the risk of waste, the court in Shelton Farms held that the water that the applicant had saved by removing phreatophytes was not exempt from the priority system because “[t]o hold any other way would be to weaken the priority system, and create a super class of water rights never before in existence.” Id. at 1326.
¶45         In this case, the state engineer testified that he would not grant a call from appropriators in the Arkansas River (because such a call would be futile) and that he had no authority to grant a senior well user’s call within the Basin. Because Meridian’s application would therefore have allowed it to use the water free from both the call of the Arkansas River and the Commission’s oversight, granting the application would effectively have created the very type of unprecedented “super decree” that the Shelton Farms court deemed inappropriate. For the reasons set forth in Shelton Farms, we cannot countenance such a result. See id.
¶46         Third, contrary to Meridian’s assertions regarding waste, a ruling in Meridian’s favor would reduce the four percent rate of recharge of the aquifer, thereby harming senior designated ground water users and impeding the Commission’s duty to administer designated ground water and to establish reasonable ground water pumping levels in an area having a common designated ground water supply. See § 37-90-111(1)(a)–(b). Such a ruling would be inconsistent with the legislature’s declared policy with respect to designated ground water.
¶47         Specifically, when the General Assembly enacted the Management Act, it affirmed that the prior appropriation doctrine applies to designated ground water, and it directed the Commission to protect senior appropriators of ground water. §§ 37-90-102(1), 37-90-111(1)(a); Thompson v. Colo. Ground Water Comm’n, 575 P.2d 372, 381 (Colo. 1978). The legislature also recognized, however, that the doctrine “should be modified to permit the full economic development of designated groundwater resources.” § 37-90-102(1); accord Goss, 993 P.2d at 1183; Thompson, 575 P.2d at 381.
¶48         The legislature thus rejected a pure appropriation doctrine for designated ground water because, whereas surface streams “are subject to seasonal recharge,” water can be “mined” from an aquifer to the point that it could take many years to restore the water level. Fundingsland v. Colo. Ground Water Comm’n, 468 P.2d 835, 839 (Colo. 1970). Accordingly, the Management Act empowers the Commission to curtail ground water pumping when the amount of water needed to fill a water right would, among other things, “result in withdrawing the ground water supply at a rate materially in excess of the reasonably anticipated average rate of future recharge.” § 37-90-111(1)(b); see also Goss, 993 P.2d at 1184 (“The modified system of prior appropriation governing [the] designated ground water basins allows appropriation only to the point of reasonable depletion, as determined by the Commission.”); Thompson, 575 P.2d at 381–82 (affirming the Commission’s policy of permitting no more than forty percent depletion within twenty-five years because this policy allowed for economic development while protecting senior appropriators and maintaining reasonable pumping levels).
¶49         The district court’s order in this case was fully consistent with these legislative determinations and, thus, with public policy.
III. Conclusion
¶50         For these reasons, we affirm the district court’s order and remand the case to that court for further proceedings consistent with this opinion.