## No. 27459

## Gordon L. Thompson v. Colorado Ground Water Commission

(575 P.2d 372)

Decided January 23, 1978. Rehearing denied February 21, 1978.

490

Marvin B. Woolf, for plaintiff-appellant.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, David W. Robbins, First Assistant, Natural Resources Section, Ben L. Wright, Special Assistant, Loren L. Swick, Special Assistant, Natural Resources Section, John C.

Ohrenschall, Assistant, Natural Resources Section, for defendant-appellee.

Moses, Wittemyer, Harrison and Woodruff, P.C., David M. Brown, Charles N. Woodruff, for amicus curiae, Dr. Foster R. Sims.

Padley & Dudden, P.C., Peter E. Schoon, Jr., for amicus curiae, L. D. Dirks, Dudden Elevator, Inc., Grover A. Ferrell, Delbert Haynes, Raymond Korte, NEBCO Corporation, Dana G. Schliep, Kenneth Weis, and Stanley Willmon.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

On February 13, 1974, Gordon L. Thompson (plaintiff) filed an application with the Colorado Ground Water Commission (commission) seeking a permit to construct a well and to appropriate designated ground water from the Northern High Plains Designated Ground Water Basin in Yuma County. The commission denied the application on the basis that the proposed appropriation would unreasonably impair existing water rights. In reaching its decision, the commission used its three-mile test as modified by its state-line policy to determine the availability of unappropriated water. The plaintiff requested and was granted a hearing before the commission, which sustained the denial of the plaintiff's application on July 7, 1975.

The plaintiff thereafter appealed the commission's decision to the district court in and for Yuma County and a trial de novo was held pursuant to statute. Section 37-90-115, C.R.S. 1973. Expert witnesses appeared on behalf of both the plaintiff and the commission. On April 14, 1976, the district court entered a judgment denying the application because unappropriated water was not available when the application was considered under the commission's guidelines. The district court subsequently amended its judgment to include additional findings of fact and denied the plaintiff's motion for a new trial on July 29, 1976. This appeal was then perfected.

The plaintiff alleges as grounds for reversal that: (1) the state-line policy is a rule adopted by the commission in violation of the provisions of the Administrative Code; (2) the state-line policy contravenes statutory and constitutional provisions concerning the use and conservation of Colorado waters; (3) the commission failed to determine the actual quantity of

prior existing rights; (4) the commission failed to consider statutory factors in the three-mile test on a local basis; (5) evidence of water use and aquifer depletion in areas distant from the plaintiff's proposed well location was improperly admitted, and (6) the commission used a 25-year aquifer life as of the date of the application in its three-mile test. We reverse and remand for proceedings not inconsistent with this opinion.

I.

■ The plaintiff's first allegation of error is that the state-line policy is a rule adopted by the commission in violation of the provisions of the Administrative Code. We rejected this argument when directed at the commission's three-mile test in *Fundingsland v. Colorado Ground Water Commission*, 171 Colo. 487, 468 P.2d 835 (1970):

"The function of this Court is not to review the decision of the commission, but to review the judgment of the district court handed down in the trial de novo. The provisions of Article 16 of the Administrative Code do not apply to the judicial branch of government. C.R.S. 1963, 3-16-1(1)(b). It is beyond the scope of this review to question whether the commission, in its denial of the plaintiff's application, used the three mile test as an administrative rule or as a tool with which to resolve the facts."

The district court in this case properly considered the commission's three-mile test as modified by the state-line policy to determine whether the plaintiff's application should be granted. The use of the commission's policy guidelines by the district court in the trial de novo, therefore, permits the plaintiff and *amicus curiae* to challenge the underlying policies.

II.

■ Both the district court and the commission based their respective decisions on the commission's three-mile test as modified by its state-line policy. We held that the three-mile test evidenced a reasonable method of administering ground water in *Fundingsland v. Colorado Ground Water Commission, supra.*

The three-mile test requires that a circle with a radius of three miles be drawn around the proposed point of diversion. Calculations are then made to determine the volume of water available for appropriation within the circle. This test takes into account all of the factors specified by statute. Section 37-90-107(5), C.R.S. 1973. Additionally, the commission considers the saturated thickness of the aquifer in the three-mile circle, the number of wells in the circle, and the yield of the wells within the circle. The total appropriation from within the circle is determined by adding the yield of all existing well rights. Finally, as noted in *Fundingsland v. Colorado Ground Water Commission, supra*:

"A rate of pumping is determined which would result in a 40% depletion of the available ground water in that area over a period of 25 years. If that rate of pumping is being exceeded by the existing wells within the circle, then the application for a permit to drill a new well may be denied."

When the three-mile test was conducted in the plaintiff's case, 24% of the circle fell in Nebraska. That resulted in the modification of the three-mile test by the commission's state-line policy. Dewayne R. Schroeder, a water resource engineer and staff member of the commission, explained the state-line policy to the court. Schroeder testified that when a circle extends into an adjoining state, only the saturated thickness of the Colorado portion of the formation is used in calculations utilizing the three-mile test to determine the volume of water contained within the circle. The amount of water subject to appropriation in the entire circle is then multiplied by the percentage of the circle in Colorado to produce the amount of water which can be appropriated by Colorado appropriators. Finally, the number of Colorado wells and the total quantity of their rights is calculated to determine the level of existing appropriation. Unless excess water exists under the three-mile test as modified, the application is denied.

If the commission had ignored the state-line policy, the commission concedes that the plaintiff's application would have been granted. While the Colorado portion of the plaintiff's circle was overappropriated under the three-mile test, the circle, when considered as a whole, and with cognizance of the development in Nebraska, was not overappropriated.

The plaintiff contends that the commission's refusal to consider the saturated thickness of the entire circle and the number of wells in Nebraska is in violation of the state engineer's and the commission's duty to insure that Colorado waters are conserved and made available for use by Colorado citizens. Sections 37-81-102, 37-90-136, C.R.S. 1973. This argument rests upon the undisputed fact that the Ogallala formation slopes and flows in a northeasterly direction toward Nebraska. The plaintiff also asserts that the Ogallala formation is thicker in Nebraska and is being charged with water which flows from Colorado. Colorado water, it is argued, is, therefore, leaving the state to the detriment of Colorado residents and contrary to statutory provisions. The plaintiff further contends that the state-line policy denies his constitutional right to divert unappropriated water. *Colo. Const.*, Art. XVI, Sec. 6. An *amicus curiae* brief asserts that the state-line policy denies applicants their rights to the equal protection of the laws. *U. S. Const.*, Amend. XIV.

We are in agreement with the district court's conclusion that the state-line policy is a matter properly within the legislatively delegated powers of the commission. The Colorado Ground Water Management Act, section 37-90-101, *et seq.*, C.R.S. 1973, charges the commission with various duties. It must protect senior appropriators against unreasonable injury, foster the full economic development of designated ground water resources, and conserve designated ground water resources. Sections 37-90-102, 111, C.R.S. 1973. The state-line policy, in conjunction with the three-mile test, implements these legislative directives in a reasonable and consistent manner.

 Expert testimony supported the commission's position that overappropriation of the aquifer at the state line, with the intent to stabilize or reverse the aquifer flow to the benefit of Colorado, would seriously injure vested Colorado rights far west of the state line and could ignite a destructive aquifer depletion race with Nebraska, an adjoining state. Evidence that a portion of Colorado's ground water naturally flows into adjoining states, when considered in the context of the commission's overall ground water policy, does not establish a breach of statutory duty by the commission in its determination.

Furthermore, the plaintiff's right to divert unappropriated water is not violated if unappropriated water does not exist under the commission's three-mile test. *Fundingsland v. Colorado Ground Water Commission, supra.*

Finally, the equal protection argument is completely without merit. The same formula and factors were considered in this case as would properly be before the commission or court if the circle were entirely within Colorado. The only difference is that in this case the figures were reduced proportionately to insure that the commission did not exceed its jurisdiction and illegally authorize the appropriation of Nebraska ground water.

### III.

 In determining whether a proposed well will unreasonably injure the rights of existing appropriators, the commission is required to consider the "quantity of existing claims." Section 37-90-107(5), C.R.S. 1973. The plaintiff does not challenge the duty of the commission to protect valid senior rights, but does take issue with the manner in which the commission determines the "quantity of existing claims." He asserts that the "existing claims" protected by the commission are inflated and unenforceable under Colorado water law.

 The "quantity of existing claims" which must be considered by the commission, is the sum of all water rights which have been appropriated and those water rights which are in the process of being appropriated under conditional permits. The legislative intent evidenced in the Colorado Ground Water Management Act is that the issuance of final permits, which requires proof and verification of the extent of beneficial use, would serve a function equivalent to the final surface water decree and establish senior rights. But to compute the "quantity of existing claims" only on the basis of rights represented by final permits would ignore the rights that holders of conditional permits have to perfect their appropriations to the full extent of their conditional permits. These rights in the process of being appropriated, therefore, must be considered by the commission in their calculations of the "quantity of existing claims." The plaintiff's arguments are directed, not at the procedure contemplated by the legislature, but rather at the commission's failure to issue final permits and its assumption that all conditional permits represent valid water rights to the full extent

of the permit.

Leonard A. Mercer, the chief of the ground water section of the state engineer's office, testified before the commission that the usual claim for the irrigation of a standard 160-acre tract is exaggerated by 21% because most irrigators employ pivot-point sprinklers which operate in a circular manner, irrigating only 126 of the 160 acres claimed. He stated that, "This is a thing that is going on that I deeply wish the commission would change. It is a safety factor, but it is also a phoney appropriation right." A second factor which inflates the commission's appropriation figure is the commission's policy of allocating thirty inches (2 1/2 acre feet) for each irrigated acre when, in fact, these acres normally consume only sixteen to eighteen inches.

The district court made the following findings of fact which are supported by the record:

"The Court finds that the amount of acreage claimed in the application to construct a well and in the conditional permits heretofore granted is rarely the amount of acreage actually irrigated.

"The Court further finds that as of the date of the trial of the issues in this case no independent investigation had been made by any regulatory agency as to the amount of water actually placed to a beneficial use under any of the conditional permits, and that as of that time no final permits had been issued.

"The Court further finds that in all prior instances permit claimants had claimed at least the two and one half acre feet permitted by the Commission. The evidence further discloses that the average annual application in the area involved has been approximately eighteen inches per year."

The commission seeks to justify its present policy with two arguments. First, it contends that it is required by statute to consider the quantity of existing claims under conditional permits, regardless of the actual extent of beneficial use, because they represent valid rights which can be exercised to their full extent. The commission's policy guidelines, therefore, require that the three-mile test be made "with the assumption that, for the purpose of this analysis, all rights to appropriate are being fully exercised." Secondly, the commission asserts that the priority list it has prepared, pursuant to section 37-90-109, C.R.S. 1973, is equivalent to the issuance of final permits and has the effect of making the listed conditional permits final and enforceable.

█ If final permits had been issued, pursuant to section 37-90-108, C.R.S. 1973 (1976 Supp.), no error would be found in the policy guideline directive. Final permits, however, have not been issued, and conditional permits do not permit their holders to sleep on water rights and later expand their use to the full extent of their permits. *See Colorado River Water Conservation District v. Twin Lakes Reservoir and Canal Company*, 171 Colo. 561, 468 P.2d 853 (1970).

■ Regardless of the quantity specified in a decree, the amount of water actually applied to beneficial use defines the full extent of the water right. *Green v. Chaffee Ditch Company*, 150 Colo. 91, 371 P.2d 775 (1962). Normally, the extent of beneficial use and the measure of the water right is fixed at the time a final decree is entered. The legislature also intended that the extent of beneficial use would limit the ground water appropriator by providing for the issuance of final permits based upon proof of beneficial use. Section 37-90-108, C.R.S. 1973 (1976 Supp.).

■ The commission cannot rely upon conditional permits as though they are enforceable "existing claims" without implementing the legislative scheme which includes the issuance of final permits. Such a practice has two effects. First, it does afford protection as contemplated by the legislature to appropriators who are proceeding according to statutory directive to place the full amount of water under their conditional permits to beneficial use. But, secondly, it permits appropriators who have placed a lesser quantity of water to beneficial use, and who are not proceeding with due diligence to place the full quantity of water under their conditional permits to beneficial use, to sleep on water rights which are not validly appropriated under Colorado law. *Green v. Chaffee Ditch Company, supra.*

The commission's second argument is based upon the testimony of C. J. Kuiper, the state engineer and executive director of the commission. Kuiper testified that the priority list prepared by the commission has the "stature of a final permit," and that the issuance of final permits was no more than a "ministerial act" by virtue of the commission action on the priority lists.

To determine whether this "equivalency" argument has merit, the final permit provision of the Colorado Ground Water Management Act must be compared with the priority list procedure followed by the commission. The legislature specified the following requirements for the issuance of final permits:

"37-90-108. *Final permit — evidence of beneficial use — limitations.* (1) After having received a conditional permit to appropriate designated ground water, the applicant shall proceed with due diligence to construct the well or other works necessary to apply the water to a beneficial use. The applicant shall, upon completion of the well, furnish the commission information as to the maximum sustained pumping rate in gallons per minute, measured by such procedure as prescribed by the commission, such rate to be certified by a licensed water well drilling contractor or pump installation contractor, by three disinterested persons, or as authorized by the commission. *The applicant shall also furnish the commission with such eviaence in the form prescribed by the commission as will demonstrate that the water has been put to*

*beneficial use.*

"(2) *If after due investigation the commission finds that the water has been put to beneficial use* and that the other terms of the conditional permit have been complied with, *the commission shall order the state engineer to issue a final permit* to use designated ground water at the rate determined by the procedure prescribed in subsection (1) of this section and containing such limitations and conditions as the commission shall deem necessary to prevent waste and for the protection of other appropriators.

"(3) A conditional permit to appropriate designated ground water shall expire and be of no force or effect at the expiration of one year from the date of its issuance, unless the conditions set forth under subsection (1) of this section have been complied with within that time, or unless extended by the commission for a period certain upon good cause shown, or unless, after the conditions set forth under subsection (4) of this section are complied with, the commission finds that the conditional permit should remain in force and effect.

"(4) The procedural requirement that a statement of beneficial use shall be filed shall apply to all permits wherein the water was put to beneficial use since June 30, 1969. If information pertaining to completion of the well as required in subsection (1) of this section has been received, but evidence that water has been placed to beneficial use has not been received as of the expiration date of the conditional permit, the commission shall so notify the applicant by certified mail. The notice shall give the applicant the opportunity to submit proof that the water was put to beneficial use prior to the expiration date, but, due to excusable neglect, inadvertence, or mistake, the applicant failed to submit the evidence on time. The proof must be received by the commission within twenty days of receipt of the notice by the applicant. . . ." (Emphasis added.)

The state engineer described the procedure followed by the commission in the preparation of the priority lists. Basically, only the existing records of the state engineer's office were used. The information contained therein was accepted as being correct without any verification. A protest and hearing procedure was provided to permit interested persons to challenge particular water rights. Not surprisingly, however, few water rights were challenged.

The commission never undertook an independent investigation to determine whether the amount of water claimed had ever been put to beneficial use. Indeed, the state engineer frankly admitted that he could not determine whether any of the claims had been overstated, because no independent investigation had been made. A reason given for the commission's failure to make such investigation was the asserted lack of funds and personnel.

A comparison of the statutory final permit procedure and the priority procedure followed by the commission in the preparation of their lists clearly establishes that the commission's priority lists are not equivalent to final permits. The final permit statute requires that the holder of a conditional permit provide the commission with evidence of beneficial use and that the commission engage in an investigation to confirm that use before a final permit can issue. Section 37-90-108, C.R.S. 1973 (1976 Supp.); *See Colorado River Water Conservation District v. Twin Lakes Reservoir and Canal Company, supra.* This procedure places the burden on the appropriator to prove that he has made a valid appropriation consistent with Colorado law. The commission's priority list procedure has had the effect of shifting the burden of proof to potential protestants and of excusing the commission from its statutory duty. The legislature, however, intended that the commission engage in a confirmatory investigation and that the issuance of final permits be a meaningful action.

The final permit is essential to the legislative scheme for the administration of ground water rights. Once final permits are issued, the "quantity of existing claims" can be determined by combining the quantity of rights evidenced by final permits with the quantity of rights represented by conditional permits engaged in the statutory process that will result in the issuance of a final permit. Only then can the commission conclude with certainty whether unappropriated water exists within a given three-mile circle. The commission's failure to follow the legislative directives contained within the Colorado Ground Water Management Act may have had the effect of denying the plaintiff his statutory right to divert unappropriated designated ground water.

## IV.

When the commission considers an application under the three-mile test, it determines the average depth of saturated thickness for the particular circle, but assigns basin-wide values for the other test factors. The plaintiff introduced evidence in support of his contention that local values for specific yield, precipitation recharge, and irrigation recharge were different from those routinely used by the commission. It was his position that if the local values had been used, a larger volume of appropriable water would have resulted from the three-mile test.

The commission's adoption of the three-mile test was based upon its conclusion that a well would have its most significant effect upon the area contained within the three-mile circle. Optimally, the test would be conducted with local values. Administratively, however, it would be expensive and time-consuming for the commission to undertake investigations to determine local values for these factors. Moreover, some of these factors are relatively constant on a basin-wide basis, which would justify the use of an average value without further research.

■ Nonetheless, applicants seeking to appropriate designated ground water must be permitted to submit evidence that local values should be substituted for the more general basin values. Such evidence must be considered and, if persuasive, be incorporated into the test. When an applicant presents such evidence, the reviewing body must make findings of fact as to each challenged factor. The district court failed to make the necessary findings in this case.

## V.

■ The plaintiff contends that the district court erred by admitting evidence concerning water conditions in areas far removed from his three-mile circle. The challenged evidence established that other areas within the same aquifer formation had experienced drastic declines in the water levels. Since the Ogallala formation is an inter-connected, water-bearing formation, no error resulted from the admission of the challenged evidence.

## VI.

The General Assembly rejected the pure appropriation doctrine as to ground water. It declared that while the appropriation doctrine should be recognized, it must be modified to permit the "full economic development of designated ground water resources." Section 37-90-102, C.R.S. 1973. The commission's policy of permitting no more than 40% depletion within 25 years, adopted in 1967, effected the modification contemplated by the legislature. The policy permits the economic development of this essentially nonrenewable resource through regulated mining while affording reasonable protection to senior appropriators.

We recognized the unique nature of ground water resources in *Fundingsland v. Colorado Ground Water Commission, supra*:

"Underground water basins require management that is different from the management of surface streams and underground waters tributary to such streams. In the case of the latter waters, seasonal regulation of diversion by junior appropriators can effectively protect the interests of more senior appropriators and no long range harm can come of overappropriations since the streams are subject to seasonal recharge. The underground water dealt with by 148-18-1 is not subject to the same ready replenishment enjoyed by surface streams and tributary ground water. It is possible for water to be withdrawn from the aquifer in a rate in excess of the annual recharge creating what is called a mining condition. Unless the rate of pumping is regulated, mining must ultimately result in lowering the water balance below the level from which water may be economically withdrawn. Due to the slow rate at which underground waters flow through and into the aquifer, it may be many years before a reasonable water level may be restored to a mined aquifer.

"It is clear that the policies of protecting senior appropriators and maintaining reasonable ground water pumping levels set forth by the

underground water act require management which takes into account the long range effects of intermittent pumping in the aquifer. In this case all of the experts testifying before the commission and the district court were in agreement that a mining condition exists in the Northern High Plains Designated Ground Water Basin. The commission has determined that proper use of the ground water resource requires that the mining be allowed to continue. *However, the maximum allowable rate of depletion, at least when considering applications for permits to drill new wells, has been set at 40% depletion in 25 years. . . .*" (Emphasis added.)

The plaintiff accepts the validity of the commission's policy, but challenges the manner in which it has been administered. The commission applies the 40%/25-year formula as of the date of each new application, and not as of 1967. The plaintiff asserts that the commission should consider only the number of years remaining until 1992 and determine whether the present level of appropriation would result in greater than 40% depletion of the 1967 aquifer level. We disagree.

The General Assembly, confronted with the task of adapting the appropriation doctrine to a mining situation, directed the commission to protect senior appropriators against unreasonable injury while at the same time permitting the full economic development of Colorado's ground water resources. Sections 37-90-102, 37-90-111(1)(a), C.R.S. 1973. The commission's practice of applying the three-mile test as of the date of each application prolongs the aquifer's viable life in a manner consistent with the legislature's directives.

Two results would follow were the commission to adopt the plaintiff's position. First, the computations that would be necessary to properly manage Colorado's ground water resources in the manner suggested by the plaintiff would result in an administrative nightmare. And, secondly, the plaintiff's position would implement a policy which is inconsistent with the legislature's intent.

The commission is directed to recognize and protect prior appropriations of ground water and to maintain reasonable ground water pumping levels. Section 37-90-102, C.R.S. 1973. The legislature did not intend that all ground water resources would be depleted by 1992. Nonetheless, acceptance of the plaintiff's argument would cause us to interpret the statute so as to permit all designated ground water basins to be dried up by 1992 and to find that no constraints could be placed upon the rate of depletion as long as no more than a 40% depletion occurred by 1992. We recognized a different legislative intent in *Fundingsland v. Colorado Ground Water Commission, supra*, wherein we stated that "the maximum allowable rate of depletion, *at least when considering applications for permits to drill new wells*, has been set at 40% depletion in 25 years." (Emphasis added.)

■ We find that the commission's application of the three-mile test as of the date of each new application protects prior appropriations, maintains reasonable pumping levels, and permits the full economic development of these ground water resources in an orderly manner. The commission's present practice is consistent with the legislative intent expressed in the Colorado Ground Water Management Act and will not be disturbed by this court.

This opinion is not intended to affect valid water rights which are presently represented by conditional permits. The commission's failure to proceed in accordance with the legislature's mandate will not be permitted to adversely affect existing appropriations. The commission and the state engineer are directed by statute to issue final permits by implementing the procedures provided in section 37-90-108, C.R.S. 1973 (1976 Supp.). Final permits, when issued, will protect existing rights based upon the extent of beneficial use. Section 37-90-108, C.R.S. 1973 (1976 Supp.).

Accordingly, the judgment is reversed, and the cause is remanded to the trial court with directions to enter findings of fact as directed in this opinion and for proceedings not inconsistent with this opinion.

MR. JUSTICE GROVES concurs in the result.

MR. JUSTICE GROVES concurring in the result:

My concern with this opinion relates to the contents of part III thereof. Insofar as this portion relates to conditional permits presently issued, it is completely emasculated by the next to last paragraph of the opinion. I do not necessarily subscribe to the last sentence of part III portion of the opinion.