UPPER BLACK SQUIRREL CREEK GROUND WATER MANAGEMENT DISTRICT, Defendant–Appellant/Cross–Appellee,

v.

David GOSS, Plaintiff–Appellee/Cross–Appellant,

v.

Colorado Ground Water Commission and Cherokee Metropolitan District, Defendants–Appellees/Cross–Appellees.

No. 99SA96.

Supreme Court of Colorado, En Banc.

Feb. 22, 2000.

1178

Lind, Lawrence & Ottenhoff, LLP, Kim R. Lawrence, P. Andrew Jones, Greeley, Colorado Attorneys for Defendant–Appellant/Cross–Appellee.

Hill & Robbins, P.C., Dennis M. Montgomery, Denver, Colorado Attorneys for Plaintiff–Appellee/Cross–Appellant.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael McLachlan, Solicitor General, Edward R. Kowalski, Assistant Attorney General, Natural Resources and Environment Section Denver, Colorado Attorneys for Defendants–Appellees/Cross–Appellees.

White & Jankowski, LLP, Michael D. White, David C. Taussig, Denver, Colorado Attorneys for Amici Curiae for Eagle Peak Farms, Ltd. and Prospect Valley Farms, Ltd.

Justice HOBBS delivered the Opinion of the Court.

This appeal is from a declaratory judgment of the District Court for El Paso County entered by the designated ground water judge (Ground Water Judge). The suit arose when an individual well owner, David Goss (Goss), demanded that either the Colorado Ground Water Commission (Commission) or the Upper Black Squirrel Creek Ground Water Management District (Management District) issue an order curtailing ground water withdrawals by the Cherokee Metropolitan District (Cherokee District) from its junior well (Cherokee Well) allegedly causing injury to Goss's senior well (Goss Well) in the Upper Black Squirrel Creek Designated Ground Water Basin (Designated Basin).[1] Both the

---

1. The Upper Black Squirrel Creek Designated Ground Water Basin is located northeast of Colo-

Commission and the Management District refused to take action on Goss's demand for enforcement of his priority, each claiming that the other agency had authority over the matter. The Ground Water Judge held that the Management District, not the Commission, had authority to issue or refuse to issue well withdrawal curtailment orders within Management District boundaries. We agree with the decision of the Ground Water Judge.

## I.

The Goss Well operates under Well Permit No. 15389–F. The permit allows irrigation of forty acres, with an annual appropriation of 200 acre-feet of water. The allowable pumping rate is 200 gallons per minute. The Goss Well has a number two priority on the Commission's priority list for the Designated Basin. The Cherokee Well operates under Permit No. 29089–F for an annual appropriation of 2,171 acre-feet of water, with an allowable pumping rate of 1,346 gallons per minute. Pursuant to a stipulation reached in the settlement of litigation, the Cherokee Well is actually limited to a lesser annual appropriation than its well permit shows.

On July 28, 1997, Goss filed a written request with State Engineer Hal Simpson, in his capacity as Executive Director of the Commission,[2] for issuance of a summary order "requiring the cessation of pumping from all wells interfering with Mr. Goss's senior water rights in the Upper Black Squirrel Creek Designated Ground Water Basin." The Commission, through the Attorney General, responded on September 15, 1997 that Goss should direct his request to the Management District as it, not the Commission, had authority over his request.

In the meantime, on September 2, 1997, Goss had filed a written request with the Management District to enjoin the Cherokee Well and other unnamed wells from operating:

I hereby request that the District exercise its authority under Rule 15 of the District's rules and regulations, and all other pertinent sources of authority, to enjoin the operation of Cherokee Water District Well No. 6 and any other wells which may be impacting negatively Mr. Goss' rights. I further request that any hearing necessary to resolve this matter be held forthwith.

At its meeting of December 2, 1997, the Management District voted to deny Goss's request on the basis that it did not have authority over it. Goss then filed a complaint with the El Paso County District Court. He sought: (1) a writ of mandamus compelling either the Commission or the Management District to "order the cessation of withdrawal of water from Cherokee Well No. 6 and any other wells which may be causing material injury to Goss' senior water rights," (2) an injunction and award of damages against the Cherokee District, and (3) a declaratory judgment against the Commission, the Management District, the Cherokee District, and unknown well owners designated as Does 1–50 for determination of rights and obligations regarding enforcement of the Goss Well priority.

The Management District answered and filed a cross-claim against the Commission for declaratory judgment that the Commission, not the Management District, had authority over Goss's request for enforcement of his well's priority. The Commission took precisely the opposite position in its answer and motion to dismiss. The Cherokee District denied any interference with the Goss Well and moved for dismissal on the ground that Goss had failed to join indispensable parties, "namely the owners of all other prioritized water rights located within the basin."

In issuing his declaratory judgment that the Management District had authority over

rado Springs at the southern end of the Denver Basin. *See* "Aquifer Map of the Denver Basin, Plate 1," Division of Water Resources, State of Colorado. On May 1, 1968, the Commission entered an order designating the Upper Black Squirrel Basin. *See Sweetwater Dev. Corp. v. Schubert Ranches*, 188 Colo. 379, 382, 535 P.2d 215, 217 (1975).

2. The Commission has authority to delegate many of its functions to the State Engineer; any person aggrieved by the State Engineer's actions under the delegation may appeal to the Commission. *See* § 37–90–104(6), 10 C.R.S. (1999).

Goss's request to enforce the priority of his well, the Ground Water Judge reasoned:

. [T]he General Assembly has unambiguously granted the district and not the commission with jurisdiction over this dispute.... The commission has authority concerning the regulation of use, control and conservation of nontributary ground water resources *unless the permitted well is located within a district,* in which case the district has authority.

(Emphasis added.)

The Ground Water Judge also determined that alleged injury to a senior appropriation in a designated ground water basin is a matter "best left initially to agency expertise and fact finding, given the district's jurisdiction over this matter." Consequently, the court held that an administrative remedy for alleged injury to a permitted well right resides in the Management District and must first be exhausted before recourse to the district court. The Ground Water Judge also held that a writ of mandamus did not lie against the Management District because the statute affords discretion in its administration of wells, rather than establishing a nondiscretionary duty. We affirm the judgment of the district court.

## II.

We hold that a Ground Water Management District has authority under sections 37–90–111(1)(a) and –130(2)(j), 10 C.R.S. (1999), to issue well curtailment orders to enforce priorities within its boundaries. The Management District's issuance of, or refusal to issue, such an order is subject to a written request for a mandatory hearing before the Management District, followed by its written decision, pursuant to section 37–90–131(1)(c), 10 C.R.S. (1999).

## A. Differences Between Natural Stream and Ground Water Act Regulatory Regimes

In his demands to the Commission and the Management District for enforcement of the

Goss Well priority, and in his second amended complaint in district court, Goss repeatedly alleged violations of his "[c]onstitutionally-guaranteed water rights" and alleged the responding agency had "a non-discretionary duty under the Constitution and statutes of the State of Colorado" to order cessation of water withdrawal by any wells "which may be causing material injury to Goss' senior water rights."

These contentions might be appropriate were we dealing with waters of the natural stream. Here, however, we deal with designated ground water, which is appropriated and administered differently. While we agree that Goss enjoys a vested right to withdraw designated ground water, in accordance with the terms of his permit, and has a senior priority to almost all other wells within the Designated Basin and the Management District, administration of his right stems not from the authority of the Colorado Constitution and its implementing provision, the Water Rights Determination and Administration Act (1969 Act), but rather from statutory enactments, namely the 1965 Ground Water Management Act and amendments thereto (1965 Act).

The ground water appropriation, injury, and enforcement provisions of the 1965 Act differ in important respects from those of the 1969 Act, which govern the waters of the natural stream. Because these differences bear upon resolution of the issue now before us, we briefly review how the General Assembly has chosen to address the appropriation and administration of designated ground water, in contrast to surface water and tributary ground water.[3]

All water within Colorado is a public resource. No person has ownership in this public water resource; rather, persons may obtain rights of use under applicable provisions of law. *See Chatfield East Well Co. v. Chatfield East Property Owners Ass'n,* 956 P.2d 1260, 1268 (Colo.1998). The administration of a person's water right depends

---

**3.** No well can be established in Colorado without issuance of a well permit, *see* §§ 37–90–107, –137(1), –92–302(2), 10 C.R.S. (1999), but the ground water intercepted by the well is appropri-ated and administered differently depending upon whether or not it is considered to be tributary ground water.

upon the category of waters to which the use right attaches. *See id.* Colorado's authority to address the creation and administration of water rights derives from nineteenth-century congressional action. In the early days of western settlement, the United States Congress made all waters of the public domain available for disposition under the customs and laws of the States and Territories, subject to exercise of its commerce power, its power to reserve rights to unappropriated waters in priority for federal or Native American purposes, and the navigation servitude. *See California v. United States,* 438 U.S. 645, 657–58, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *United States v. City & County of Denver,* 656 P.2d 1, 17 (Colo.1982).

This state's chosen water law doctrine stems from the experience of its people in settling a semi-arid state.[4] Colorado's surface streams pass through only a fraction of the surface acreage of the eastern high plains of Colorado, which comprise nearly one third of the state. The need to ration use of essentially non-renewable ground water in the high plains region was a primary impetus for adoption of the 1965 Act. *See* Mel Griffiths & Lynnell Rubright, *Colorado* 224 (1983); Veronica A. Sperling & David M. Brown, *Outline of Colorado Ground Water Law,* 1 U. Denv. Water L.Rev. 275, 276 (1998).

■ The Colorado Constitution, through article XVI, sections 5 and 6, provides for establishment of use rights in waters of the natural stream. These rights arise when appropriators place theretofore unappropriated surface water or tributary ground water

to beneficial use.[5] Courts adjudicate these water rights, and water officials administer the court decrees pursuant to the 1969 Act. *See Santa Fe Trail Ranches Property Owners Ass'n v. Simpson,* 990 P.2d 46, 52 (Colo. 1999).[6]

■ In addition, there is in Colorado a category of the public water resource that is not part of the natural stream. Use of this ground water has a de minimus effect on any surface stream. *See e.g., Kuiper v. Lundvall,* 187 Colo. 40, 44, 529 P.2d 1328, 1331 (1974) (holding that ground water that takes more than a century to reach the stream is not a part of the surface stream as contemplated by the Colorado Constitution and is not subject to the prior appropriation provisions of the Colorado Constitution). The General Assembly has plenary authority over the allocation and administration of this category of the public water resource. *See State v. Southwestern Water Conservation Dist.,* 671 P.2d 1294, 1316 (Colo.1983).

We have deferred to the General Assembly's choice to allocate and enforce rights in ground water not part of the natural stream waters, in three subcategories: (1) designated ground water, *see* § 37–90–107, 10 C.R.S. (1999); (2) nontributary water outside of designated ground water basins, *see* § 37–90–137(4)(a), 10 C.R.S. (1999); and (3) nontributary and not-nontributary Denver Basin bedrock water of the Dawson, Denver, Arapahoe, and Laramie–Fox Hills aquifers. *See id.; Chatfield East,* 956 P.2d at 1270 (Denver Basin nontributary and not-nontributary water); *Bayou Land Co. v. Talley,* 924 P.2d 136, 148–49 (Colo.1996) (nontributary ground water outside of designated ground water basins); *North Kiowa–Bijou Management*

---

**4.** "Both Colorado and Wyoming are along the apex of the Continental Divide, and include high mountain ranges where heavy snows fall in winter and melt in late spring and early summer; this being the chief source of water supply. Small streams in the mountains gather the water from the melting snow and conduct it to larger streams below, which ultimately pass into surrounding states. The flow in all streams varies greatly in the course of the year, being highest in May, June, and July, and relatively very low in other months." *Wyoming v. Colorado,* 259 U.S. 419, 457–58, 42 S.Ct. 552, 66 L.Ed. 999 (1922).

**5.** For an explanation of the hydrological interrelationship between tributary ground water and surface water, see Robert Jerome Glennon, *The Concept of Capture: The Hydrology and Law of Stream/Aquifer Interactions,* 43 Rocky Mtn. Mineral L. Inst. 22–1 (1997).

**6.** In *Santa Fe Trail Ranches,* 990 P.2d at 57–58, we discussed the legislature's rejection of the proposition that water officials may determine the water rights of natural stream appropriators. In contrast, the Commission, an administrative agency, determines the water rights of designated ground water appropriators.

*Dist. v. Ground Water Comm'n,* 180 Colo. 313, 317–18, 505 P.2d 377, 379–80 (1973) (designated ground water).[7]

The General Assembly's role in prescribing regimes that differ from Colorado's natural stream prior appropriation doctrine stems from its legislative prerogatives and its decision to conserve, for reasonable use, ground water that is being mined.[8] In *Fundingsland v. Colorado Water Comm'n,* 171 Colo. 487, 495, 468 P.2d 835, 839 (1970), we recognized that the legislature's approach is based upon the difference between renewable and non-renewable water resources:

> Underground water basins require management that is different from the management of surface streams and underground waters tributary to such streams. In the case of the latter waters, seasonal regulation of diversion by junior appropriators can effectively protect the interests of more senior appropriators and no long range harm can come of overappropriations since the streams are subject to seasonal recharge. The underground water dealt with by 148–18–1 (1963 C.R.S.) is not subject to the same ready replenishment enjoyed by surface streams and tributary ground water. It is possible for water to be withdrawn from the aquifer in a rate in excess of the annual recharge, creating what is called a mining condition. Unless the rate of pumping is regulated, mining must ultimately result in lowering the water balance below the level from which water may be economically withdrawn. Due to the slow rate at which underground

waters flow through and into the aquifer, it may be many years before a reasonable water level may be restored to a mined aquifer.

In sum, designated ground water priorities are administered under the 1965 Act, *see* § 37–90–103(6)(a), (7)-(9), 10 C.R.S. (1999), rather than the 1969 Act, *see* §§ 37–92–102(1)(a), –103(11), 10 C.R.S. (1999) (distinguishing tributary ground water from designated ground water). *See also* § 37–92–602(1)(a), 10 C.R.S. (1999) (exempting designated ground water from the 1969 Act).[9]

## B. Allocation of Designated Ground Water

The legislature authorized the Commission to create designated ground water basins for the purpose of (1) allocating water for economic development that is essentially unavailable to fill decreed surface rights,[10] (2) restricting depletions of this ground water to reasonable conservation levels, and (3) establishing priorities through operation of completed permitted wells to the extent of actual beneficial use. *See Peterson v. Ground Water Comm'n,* 195 Colo. 508, 513, 579 P.2d 629, 632–33 (1978); *Thompson v. Colorado Ground Water Comm'n,* 194 Colo. 489, 494, 499, 575 P.2d 372, 376, 380 (1978).

The General Assembly chose a modified system of prior appropriation for the establishment and administration of rights to use designated ground water. *See* § 37–90–102(1), 10 C.R.S. (1999). It intended this modified appropriation system to: (1) permit

7. We have held that the legislature's exercise of its plenary power over ground water use under mining conditions has modified the normal presumption that all ground water is tributary to a surface stream, unless otherwise shown. In the absence of such legislation we have applied the presumption that ground water is tributary. *See Water Rights of Park County Sportsmen's Ranch LLP v. Bargas,* 986 P.2d 262, 267 (Colo.1999); *Safranek v. Town of Limon,* 123 Colo. 330, 334, 228 P.2d 975, 977 (1951).

8. In 1929 there were only 800 irrigation pumps in the entire state. By 1969, there were 8,400. *See* Kenneth I. Helphand, *Colorado: Visions of an American Landscape* 130 (1991).

9. For a discussion of the roles of the Commission and management districts, see generally James

N. Corbridge, Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law,* 85–88, 357–62 (rev. ed.1999).

10. The problem of finding water sources for domestic and agricultural use on the eastern high plains of Colorado has a long history. In August 1890, for example, the Secretary of Agriculture submitted a report to the United States Senate entitled "A Report on the Preliminary Investigation to Determine the Proper Location of Artesian Wells within the Area of the Ninety–Seventh Meridian and East of the Foothills of the Rocky Mountains." A map included with this report locates then-existing wells on the high plains, many of which were not artesian wells. *See* S. Exec. Doc. No. 222 (1890)("Map of Eastern Colorado, showing Springs, Lakes, Ponds, Artesian Wells and Drainage").

full economic development of designated ground water resources, (2) protect prior appropriations of designated ground water, and (3) protect and maintain reasonable ground water pumping levels, but not to require the maintenance of historical water levels. *See id.*[11]

In contrast to the constitutional doctrine of prior appropriation, whereby the appropriators of the waters of the natural stream themselves allocate the available supply by making beneficial use of unappropriated water, the Commission allocates the waters of designated ground water basins by permit, pursuant to the 1965 Act, and, in particular, sections 37–90–107 and 37–90–108, 10 C.R.S. (1999). *See Larrick v. District Court,* 177 Colo. 237, 239–40, 493 P.2d 647, 648 (1972).

The General Assembly has defined "designated ground water" as:

> [G]round water which in its natural course would not be available to and required for the fulfillment of decreed surface rights, or ground water in areas not adjacent to a continuously flowing natural stream wherein ground water withdrawals have constituted the principal water usage for at least fifteen years preceding the date of the first hearing on the proposed designation of the basin, and which in both cases is within the geographic boundaries of a designated ground water basin. Designated ground water shall not include any ground water within the Dawson–Arkose, Denver, Arapahoe, or Laramie–Fox Hills formation located outside the boundaries of any designated ground water basin that was in existence on January 1, 1983.

§ 37–90–103(6)(2).

■ The Commission determines in the first instance whether disputed ground water is designated ground water within a designated ground water basin or tributary

ground water that is subject to adjudication under the 1969 Act. *See Pioneer Irrigation Dist. v. Danielson,* 658 P.2d 842, 844–45 (Colo.1983); *Ground Water Comm'n v. Shanks,* 658 P.2d 847, 848 (Colo.1983). Within a designated ground water basin, citizens may establish ground water management districts through a petition and election procedure when the Commission has approved the proposed creation of the management district and its boundaries. *See* § 37–90–118, 10 C.R.S. (1999).

The Commission has established eight designated basins and has promulgated appropriation rules for each. These eight basins are: Northern High Plains, Southern High Plains, Kiowa–Bijou, Lost Creek, Upper Black Squirrel, Upper Big Sandy, Camp Creek, and Upper Crow Creek. *See generally* Rules and Regulations for Management and Control of Designated Ground Water, 2 C.C.R. 410–1 (1997); Sperling & Brown, *supra,* at 281–82.

■ The modified system of prior appropriation governing these designated ground water basins allows appropriation only to the point of reasonable depletion, as determined by the Commission. *See Colorado Ground Water Comm'n v. Dreiling,* 198 Colo. 560, 565, 606 P.2d 836, 839 (1979). Intent to appropriate for beneficial use is a necessary factor in the Commission's decision whether to grant a well permit application: Colorado's anti-speculation doctrine applies. *See Jaeger v. Colorado Ground Water Comm'n,* 746 P.2d 515, 521 (Colo.1987). If the Commission determines that there is water available for appropriation, it instructs the State Engineer to issue a permit in accordance with the Act, and applicable regulations, conservation measures and control measures. *See Kuiper v. Warren,* 195 Colo. 541, 545, 580 P.2d 32, 35–36 (1978).[12]

---

11. In *Thompson,* we said: "The General Assembly, confronted with the task of adapting the appropriation doctrine to a mining situation, directed the commission to protect senior appropriators against unreasonable injury while at the same time permitting the full economic development of Colorado's ground water resources." *Thompson,* 194 Colo. at 501, 575 P.2d at 381.

12. The Commission, through rulemaking, has declared the Alluvial Aquifer within the Upper Black Squirrel Creek Designated Ground Water Basin to be overappropriated. *See* Rule 410–1 § 5.2.6, 2 C.C.R. (1997). This means that the Commission may permit new wells to tap this resource only when it approves a replacement plan that protects other permitted appropriators against unreasonable injury. *See* §§ 37–90–

In order to grant a conditional permit, the Commission must find that the appropriation: (1) will not unreasonably impair existing water rights from the same source; and (2) will not create unreasonable waste. *See* § 37–90–107(3). In ascertaining whether a proposed use will create unreasonable waste or unreasonably affect the rights of other appropriators, the Commission:

> shall take into consideration the area and geologic conditions, the average annual yield and recharge rate of the appropriate water supply, the priority and quantity of existing claims of all persons to use the water, the proposed method of use, and all other matters appropriate to such questions.

§ 37–90–107(5). The statute prescribes a one-year period in which to construct the conditionally permitted well. *See* § 37–90–108(1)(a). For good cause shown, the Commission may grant an additional year for construction of the well. *See* § 37–90–108(1)(c).

Within three years of filing the conditional well permit application, the applicant must supply to the Commission a sworn affidavit evidencing beneficial use of the water. The Commission, in turn, determines the existence and extent of the appropriation through the mechanism of the final permit. *See* § 37–90–108(2)(a); *Berens v. Ground Water Comm'n,* 200 Colo. 170, 174, 614 P.2d 352, 355–56 (1980); *Thompson,* 194 Colo. at 499, 575 P.2d at 380.

In *Larrick v. North Kiowa Bijou Management District,* 181 Colo. 395, 404, 510 P.2d 323, 328 (1973), we held that the General Assembly's action in vesting the Commission with authority to establish designated ground water appropriation priorities in this fashion does not violate the appropriation of water, separation of powers, or delegation of judicial

power provisions of the Colorado Constitution.[13]

### C. Management District Authority

The 1965 Act requires the Commission to maintain a priority list for all wells within a designated ground water basin. As to wells for which beneficial use occurred prior to May 17, 1965, the priority date is the date on which the water was first applied to beneficial use. *See* § 37–90–109(2), 10 C.R.S. (1999). For wells created after that date, the well's priority date relates back to filing of the original permit application, if and when the well is completed and the water is placed to beneficial use. *See id.*

The case before us involves the Commission's priority list for the Upper Black Squirrel Designated Ground Water Basin, which lists the Goss well as the Number 2 priority. A management district exists for this designated basin. Having reviewed how appropriation of designated ground water proceeds through the Commission, we now determine whether the Management District has authority to administer designated ground water priorities within its boundaries.

The Commission undoubtedly has authority to administer designated ground water priorities by reason of section 37–90–111(1)(a), which provides the Commission with power to:

> supervise and control the exercise and administration of all rights acquired to the use of designated ground water. *In the exercise of this power it may by summary order, prohibit or limit withdrawal of water from any well during any period that it determines that such withdrawal of water would cause unreasonable injury to prior appropriators*; except that nothing in this article shall be construed as entitling any prior designated ground water

103(12.7), –107.5, 10 C.R.S. (1999); Rule 410–1 § 4.4.23, 2 C.C.R. (1997).

**13.** Non-tributary water outside of designated ground water basins and Denver Basin bedrock water, however, is not subject to Commission or management district jurisdiction; instead, the Assembly has chosen to allocate use rights for these resources based on the overlying land ownership and the one hundred-year life of the aqui-

fer. *See* § 37–90–137(4). These rights vest upon adjudication pursuant to sections 37–90–137(6), 10 C.R.S. (1999), and 37–92–203, 10. C.R.S. (1999) (providing for jurisdiction of water courts over determination of rights to nontributary ground water outside of designated ground water basins), or completion of a well after issuance by the State Engineer of a well permit. *See Bayou Land,* 924 P.2d at 149; §§ 37–92–137(2)(d), (4).

appropriator in the maintenance of the historic water level or any other level below which water still can be economically extracted when the total economic pattern of the particular ground water basin is considered; and further except that no such order shall take effect until six months after its entry.

(Emphasis added.) Based on this provision, the Management District argues that the Commission has *sole* authority to issue well curtailment orders, despite the existence of a Management District in the relevant area. We disagree.

■ Under both statutory authority and decisional law, the Commission is charged with establishing priority dates for wells within designated ground water basins and is empowered, in the absence of a management district, to supervise and control the exercise and administration of all rights acquired for the use of designated ground water, including limiting or prohibiting the withdrawal of water from wells when necessary to protect prior appropriators from unreasonable injury. *See* § 37–90–111, 10 C.R.S. (1999); *State v. Vickroy,* 627 P.2d 752, 757 (Colo.1981). However, we have never specifically dealt with the role of a Management District for the administration of priorities. We do so now, holding that, under sections 37–90–111(1), 37–90–130(2)(j), and 37–90–131(1)(c), the Management District, not the Commission, has authority to administer designated ground water priorities within its boundaries.

■ In construing a statute, we must give effect to the words that the General Assembly has chosen. Moreover, we must reconcile, whenever possible, seemingly conflicting provisions. *See Colorado Ground Water Comm'n v. Eagle Peak Farms,* 919 P.2d 212, 215–16 (Colo.1996) (addressing the Ground Water Management Act). In undertaking our statutory analysis, we note that section 37–90–111(1)(a), under which the Commission has authority to issue summary orders prohibiting or limiting water withdrawal from a well causing unreasonable injury to prior appropriators, immediately follows section 37–90–111(1), which states:

> In the administration and enforcement of this article and in the effectuation of the policy of this state to conserve its designated ground water resources and for the protection of vested rights and *except to the extent that similar authority is vested in ground water management districts* pursuant to section 37–90–130(2), the ground water commission is empowered to issue well curtailment orders pursuant to § 37–90–111(2).

(Emphasis added.) Section 37–90–130(2) provides that "[a]fter the issuance of any well permit" by the Commission, the Management District Board "has the authority to regulate the use, control, and conservation of the ground water of the district covered by such permit by any one or more of the following methods."[14] Subsections (a) through (j) of this statute then list the methods. Despite these provisions, the Management District argues that it only has the power to promulgate regulations, or conservation or control measures, subject to final approval by the Ground Water Commission if proper objection is made. *See* § 37–90–130(2), –131(1)(b), 10 C.R.S. (1999).

While we agree that the Management District certainly has these enumerated quasi-legislative powers, which it has exercised through adoption of the Upper Black Squirrel Creek Ground Water Management District Rules and Regulations and Statement of Policy (as amended Oct. 7, 1997), its role in the administration of permits issued by the Commission is not so limited as it claims. Among the "methods" itemized within the subcategories of section 37–90–130(2), a management district has power to "exercise such other administrative and regulatory authority concerning the ground waters of the district as, without the existence of the district,

---

**14.** The lead provisions of section 37–90–130(2) state more fully: "After the issuance of any well permit for the use of ground water within the district by the ground water commission as provided in sections 37–90–107 and 37–90–108, the district board has the authority to regulate the use, control, and conservation of the ground wa-ter of the district covered by such permit by any one or more of the following methods, but the proposed controls, regulations, or conservation measures shall be subject to review and final approval by the ground water commission if objection is made in accordance with section 37–90–131."

would otherwise be exercised by the ground water commission." *See* § 37–90–130(2)(j).

 The terms "administration," "administer," or "regulate" are widely used in the water law context to include the actions of state water officials in enforcing water rights priorities. *See, e.g.,* § 37–92–501(1), 10 C.R.S. (1999). We construe the legislature's choice of the phrase "administrative and regulatory authority" as encompassing the management districts' role in enforcing permit conditions and priorities for designated ground water. This grant of authority necessarily includes authority for making quasi-judicial decisions regarding well permits and disputes between well owners within Management District boundaries. *See Eagle Peak Farms,* 919 P.2d at 218–19.

 Because the Commission has authority to supervise and control the exercise and administration of rights acquired to the use of designated ground water "except to the extent that similar authority is vested in ground water management districts pursuant to section 37–90–130(2)," § 37–90–111(1)(a), the Management District has jurisdiction over controversies between appropriators regarding issues of injury to senior well withdrawals by junior well withdrawals. This authority includes the capacity "by summary order [to] prohibit or limit withdrawal of water from any well during any period that it determines that such withdrawal of water from said well would cause unreasonable injury to prior appropriators," authority which the Commission would have in the absence of the Management District. § 37–90–111(1)(a).[15]

Our construction of the Management District's authority implements changes to the Ground Water Management Act that the General Assembly adopted in 1979 and 1998. By these amendments, the legislature enacted a general demarcation between the Commission's permitting functions and the management districts' administrative and regulatory functions after permit issuance. *See* 1979 Colo. Sess. Laws 1371, 1373–75 (Management District's administrative and regulatory authority applies after issuance of "final" permit) *superseded by* 1998 Colo. Sess. Laws 1211, 1222–24 (deleting the word "final" to provide for administrative and regulatory authority commencing after issuance of conditional permit).

 The Management District argues that it has no authority to conduct adjudicatory hearings regarding designated ground water priorities, contending that it does not have the expert resources necessary for determination of injury to priorities. Again we disagree. Section 37–90–131(1)(c) plainly provides the mechanism by which the Management District Board receives and hears complaints regarding "the *alleged injury*" (emphasis added).[16] Under that provision, parties have the right to a hearing, to subpoena witnesses, and to be heard in person or through an attorney in Management District quasi-judicial proceedings. *See, e.g., Eagle Peak Farms,* 919 P.2d at 217, 219. The statute requires the district board, after a hearing, to issue a written decision concerning its findings and conclusions, which it shall serve on all parties. *See* § 37–90–131(1)(c). The State Engineer has authority to enforce compliance with the "orders" of the Management District, as well as those of the Commission. *See* § 37–90–110(1)(f), 10 C.R.S. (1999).

The Management District argues that the Commission and State Engineer have superior resources. The legislature has chosen, however, to assign the administrative and

---

**15.** We note that Rule 15 of the Management District's own rules anticipates its role in enforcement disputes: *"ENFORCEMENT.* By order entered at any regular or special meeting, the Board may prohibit and enjoin the use of any well used or proposed to be used in violation of these Rules and Regulations, or which well would result in an unreasonable depletion or contamination of existing ground water resources in the District." *See* Upper Black Squirrel Creek Ground Water Management District Rules and Regulations and Statement of Policy ¶ 15 (as amended Oct. 7, 1997).

**16.** Section 37–90–131(1)(c) provides in part: "Any person adversely affected or aggrieved by an act of the district board, other than the announcement of control or conservation measures or regulations, has the right to be heard by the board. Such person shall file a written request for a hearing that states the basis of *the alleged injury.*" (Emphasis added.)

regulatory functions to the management districts after permit issuance.[17] The State Engineer is Executive Director of the Commission and supervisor of the ground water section of the State Engineer's Office. By statute, the relationship between the Commission and Management District is consultative and cooperative in nature. Issues in management district adjudicatory hearings may involve the knowledge and expertise of employees of the State Engineer's Office. The Commission and its Executive Director, the State Engineer, can reasonably be expected to assist the Management District in matters involving the enforcement of priorities. *See* §§ 37–90–111(1)(d), –130(1), 10 C.R.S. (1999).[18]

### D. Management District Discretion

Contrary to Goss's assertion that the Management District had a non-discretionary duty to grant his requested relief, the statute provides that it *"may*, by summary order, prohibit or limit withdrawal of water from any well during any period that it determines that such withdrawal of water from said well would cause unreasonable injury to prior appropriators." § 37–90–111(1)(a)(emphasis added). In the context of the 1965 Act, "may" is not "shall."

Here, the 1965 Act again differs from the regime contemplated in the 1969 Act. Section 37–92–502(1) of the 1969 Act, which is applicable to administration of priorities to natural stream waters, provides that the state and division engineer *"shall* issue to the owners or users of water rights and to the users of waters of the state such orders as are necessary to implement the provisions of section 37–92–501." § 37–92–502(1), 10 C.R.S.

(1999)(emphasis added). Section 37–92–501, 10 C.R.S. (1999), in turn, states that the engineers *"shall* administer, distribute, and regulate the waters of the state in accordance with the constitution of the state of Colorado, the provisions of this article and other applicable laws, and written instructions and orders of the state engineer, in conformity with such constitution and laws." (Emphasis added.) Section 37–92–301(2) directs the engineers to distribute the waters of the natural stream according to the adjudication decrees of the courts. *See Santa Fe Trail Ranches*, 990 P.2d at 57–58.

As resources differ, so do the tools to manage them.[19] The regime established by the Ground Water Management Act provides for discretionary exercise of administrative and regulatory authority. The Ground Water Management Act empowers the Commission, or the Management District where one exists, to issue well withdrawal curtailment orders in the administration of priorities, but does not impose a non-discretionary duty to do so. *See* §§ 37–90–111(1), (2), –130(2),(2)(j).

The General Assembly chose, in the 1965 Act, to vest well curtailment authority as a discretionary power in regard to designated ground water priorities, as compared to the more directive terms of the 1969 Act. This choice stems from the General Assembly's recognition that curtailment of surface diversions in times of short supply — so that the senior diversion may have the water flow needed beneficially for exercise of its right — is more readily ascertainable than determina-

---

17. "The purpose of management districts is to give local ground water users some measure of control over the distribution and administration of designated ground water in the area." Corbridge & Rice, *supra* note 9, at 357–58.

18. If the Commission and State Engineer do not make people with pertinent evidence available for purposes of the management district's hearing, the management district could subpoena them under section 37–90–131(1)(c). Under section 37–90–131(1)(b), the Commission has authority to affirm or reject the quasi-legislative actions of the management district board, *i.e.*, regulations and control and conservation mea-

sures, and may modify them with consent of the district board. In contrast, under section 37–90–131(1)(c), quasi-judicial decisions of the management district board are not subject to Commission review, and appeal is from the management district's decision to the district court. *See* §§ 37–90–131(1)(c), –115.

19. For a comparison of the hydrologic differences between surface water and ground water, in relation to the challenges of administration and regulation, see Note, *Appropriation and Colorado's Ground Water: A Continuing Dilemma?*, 40 U. Colo. L.Rev. 133, 138–39 (1967).

tion of well-to-well injury in designated ground water basins.[20]

In designated ground water basins, conservation and reasonable depletion of the aquifer are paired with economic development objectives, making the administration of priorities more complicated.[21] Well users are not entitled to command the aquifer through a diversion that prevents other permittees from enjoying reasonable use of the ground water resource that is being depleted. *See* § 37–90–111(1)(a) (providing that a prior designated ground water appropriator is not entitled to maintenance of the historic water level, or any other level below which water still can be economically extracted when the total economic pattern of the particular designated ground water basin is considered). *See also City of Colo. Springs v. Bender*, 148 Colo. 458, 462–63, 366 P.2d 552, 555–56 (1961).[22]

Ascertaining well-to-well injury requires technical study and analysis. *See id.* at 464–65, 366 P.2d at 556; *Fellhauer v. People*, 167 Colo. 320, 341–42, 447 P.2d 986, 996–97 (1968). Whether a designated ground water well is causing unreasonable injury to another well cannot be assumed from a lessening of withdrawal yields alone, as the designated ground water aquifer is being mined and is regulated for a reasonable rate of depletion. In order to issue permits for appropriation of designated ground water, the Commission must find, in the first instance, that water is available for appropriation by a new junior well, *see* § 37–90–111(1)(b);[23] *Berens*, 200 Colo. at 175–76, 614 P.2d at 355–56, and that the new appropriation will not cause unreasonable injury or waste. *See* § 37–90–107(5); *Thompson*, 194 Colo. at 499–500, 575 P.2d at 380–81 (addressing the Commission's test for determining the availability of water for new applicants and taking into account protection of senior appropriators against unreasonable injury). The Management District's rules, its control and conservation measures, and its well spacing criteria, apply to the Commission's injury analysis in the permitting phase, as they do when the Management District addresses question of administration and enforcement. *See* §§ 37–90–111(3), –130(2); Rule 9.1, Designated Basin Rules, 2 C.C.R. 410–1 (1997).

Thus, in the administration of priorities context, if the junior well owner demonstrates compliance with permit conditions and the applicable regulations and conservation and control measures, the junior well is entitled to a presumption of reasonable, not injurious, use of the designated ground water. The burden of going forward on the issue of "unreasonable injury," *see*

20. The tools available for administering the surface water resource on a real time basis have improved markedly. *See Concerning Application for Water Rights of Midway Ranches Property Owners' Assoc., Inc. v. Midway Ranches Property Owners Assoc., Inc.*, 938 P.2d 515, 526 (Colo. 1997): "[The witness] stated that water officials employ Colorado's system of computerized monitoring stations and satellite relay to obtain reporting of actual stream flow levels every fifteen minutes, with information down loaded every four hours. The calling priorities and the resulting curtailment orders are adjusted to reflect actual stream conditions."

21. The 1969 Act itself recognizes, through its futile call provisions, that curtailment of wells should not be ordered "when, assuming the absence of ground water withdrawal by junior priorities, water would not have been available for diversion by such surface right under the priority system." § 37–92–501(1); *see also* § 37–92–102(2)(d), 10 C.R.S. (1999). The 1969 Act also provides that, if a curtailment order issues, the engineers' discontinuance order is rescinded if it does not in fact cause water to become available

to senior rights. *See* § 37–92–502(2)(a), 10 C.R.S. (1999).

22. The appropriate remedy may not be curtailment of well withdrawals. It may involve other management tools; for example, adjustment between users of the cost of drilling deeper wells, *see Bender*, 148 Colo. at 464, 366 P.2d at 556, or the Commission or Management District may fashion additional management criteria.

23. Section 37–90–111(1)(b) states that the Commission is empowered "[t]o establish a reasonable ground water pumping level in an area having a common designated ground water supply. Water in wells shall not be deemed available to fill the water right therefor if withdrawal therefrom of the amount called for by such right would, contrary to the declared policy of this article, unreasonably affect any prior water right or result in withdrawing the ground water supply at a rate materially in excess of the reasonably anticipated average rate of future recharge."

§ 37–90–111(1)(a), is with the owner of the senior priority. If the senior meets this burden, the Management District abuses its discretion if, in the absence of countervailing evidence, it refuses to prohibit or limit withdrawal of water by the junior, or take other appropriate measures to protect the senior right.[24] *See Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1113–14 (Colo.1990) (holding that the appropriate remedy must be effectuated once a determination is made that there has been injurious depletions to vested water rights).

 In the case before us, the Ground Water Judge properly concluded that: (1) alleged injury to a designated ground water priority is a matter consigned initially to agency expertise and fact finding; and (2) that the Management District had authority to hear Goss's request for issuance of an order to enforce the Goss Well priority. The Ground Water Judge recognized that Goss may renew his request for a well curtailment order to enforce his priority. If he does and the Management District fails to issue such an order, Goss may file a written request for an adjudicatory hearing with the Management District, and the District must hold the hearing.[25] Similarly, if the Management District issues a summary order against any other permitted user of designated water to enforce the Goss well priority, that user may file a written request for an adjudicatory hearing with the Management District.

## III.

Accordingly, we affirm the ruling and judgment of the district court entered by the Ground Water Judge.

---

**24.** The Management District contends that a holding in favor of its authority to administer ground water priorities of permitted wells would cast in doubt the Commission's sole authority over requested changes to the permit. We do not agree. Sections 37–90–111(1)(g), (3), specifically assign changes to the permit to the Commission, in consultation with the Management District. *See* Rule 7, Designated Basin Rules, 2 C.C.R. 410–1 (1997). Issuing the permit, and approving changes to an issued permit, are not the same as administering it. The Management District's role in the latter does not subsume the former, as is evident from the legislature's choice of role assignments in the statutes discussed in this opinion.

**25.** Because granting the requested hearing is *non-discretionary,* the Ground Water Judge, upon judicial review under sections 37–90–115 and 37–90–131(1)(c), has authority to mandate the Management District to hold the hearing if it does not do so.